# 14-2197-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee*,

v.

BARTOLOMEO VERNACE, AKA Pepe, AKA Bobby,
AKA Bobby Glasses, AKA Robert,

*Defendant-Appellant*,

ROBERT WEHNERT, AKA Bobby Werner, ANTHONY VAGLICA, AKA
Bosch, MICHAEL DOLPHIN, VITO CORTESIANO, AKA Vito Love,

*Defendants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

SETH GINSBERG
LAW OFFICE OF SETH GINSBERG
*Attorneys for Defendant-Appellant*
299 Broadway, Suite 1405
New York, New York 10007
(212) 537-9202

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................2

STATEMENT OF THE CASE ...............................................................4

    A.  Nature of the Case and Relevant Procedural History....................4

        1.  Overview ............................................................................4

        2.  Procedural History .............................................................4

    B.  The Trial .......................................................................................7

        1.  Overview ............................................................................7

        2.  The Shamrock Murders........................................................8

        3.  The Heroin Charges ..........................................................20

        4.  Organized Crime Rules and Associations..........................27

        5.  Cooperation Agreements....................................................38

    C.  Fiordilino's Violation of His Cooperation Agreement................40

SUMMARY OF THE ARGUMENT ....................................................41

ARGUMENT .......................................................................................42

Point One: There Is Insufficient Evidence to Prove that the Racketeering Acts Charging the Shamrock Murders Were Related to the Enterprise. ........................42

    A.  Standard of Review and Overview of Relevant Law..................42

    B.  The Murders Were Not Related to the Enterprise........................46

i

Point Two: There Is Insufficient Evidence to Prove that (a) Vernace Was Involved in the Heroin Charges, or (b) the Heroin Charges Were Related to the Enterprise.................................................................................................57

    A.   There Is Insufficient Evidence to Prove Vernace's Involvement in the Heroin Charges................................................................................58

    B.   The Heroin Charges Were Not Related to the Enterprise. ..........................62

Point Three: The Evidence Is Insufficient to Support the Firearms Conviction on Count Two. ........................................................................................67

Point Four: The Prejudicial Spillover from the Evidence Admitted in Support of the Murder Charges, the Heroin Charges, and the Firearms Charge Requires a New Trial on the Remaining Charges. ................................................................72

Point Five: A New Trial Is Required Based Upon Newly Discovered Evidence That a Crucial Cooperating Witness Was in Violation of a Material Term of His Cooperation Agreement Prior to, During, and Following Trial in that He Was Engaged in an Ongoing Pattern of Criminal Activity. ...................................77

CONCLUSION ...................................................................................83

CERTIFICATE OF COMPLIANCE ....................................................85

# TABLE OF AUTHORITIES

## Cases

*Bailey v. United States*, 516 U.S. 137 (1995) ..........................................................71

*Glaser v. United States*, 315 U.S. 60 (1942) ...........................................................43

*H.J. Inc. v. N.W. Bell Tel. Co.,* 492 U.S. 229 (1989) ...............................................44

*Jackson v. Virginia,* 443 U.S. 307 (1979) ...............................................................43

*Nye & Nissen v. United States,* 336 U.S. 613 (1949) ...............................................68

*Rosemond v. United States*, 134 S. Ct. 1240 (2014) ..............................67, 68, 69, 71

*United States v. Alessi,* 638 F.2d 466 (2d Cir. 1980) ..............................................78

*United States v. Berger,* 224 F.3d 107 (2d Cir. 2000) .............................................43

*United States v. Brooker*, 526 Fed. App'x 82 (2d Cir. 2013) ..................................43

*United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004) ....................................... passim

*United States v. Canova,* 412 F.3d 331 (2d Cir. 2005) ...........................................78

*United States v. Corrado,* 227 F.3d 543 (6th Cir. 2000) .........................................44

*United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006) ..........................................45

*United States v. Glenn,* 312 F.3d 58 (2d Cir. 2002) ................................................43

*United States v. Guzman*, 7 Fed. App'x 45 (2d Cir. 2001) ......................................49

*United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc).............. passim

*United States v. Long,* 917 F.2d 691 (2d Cir. 1990) ................................................44

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) .....................................58, 62

iii

*United States v. Miller,* 116 F.3d 641 (2d Cir. 1997) ..................................... passim

*United States v. Minicone,* 960 F.2d 1099 (2d Cir. 1992) .................... 44, 45, 47, 48

*United States v. Moore,* 208 F.3d 411 (2d Cir. 2000) .............................................. 43

*United States v. Naiman,* 211 F.3d 40 (2d Cir. 2000) ............................................. 72

*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007) .................................... 78, 79, 80

*United States v. Polanco,* 145 F.3d 536 (2d Cir. 1998) ........................................... 44

*United States v. Powell*, 469 U.S. 57 (1984) ........................................................... 43

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ........................... 43, 51, 66

*United States v. Riggi,* 541 F.3d 94 (2d Cir. 2008) ................................................. 43

*United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004) ............................................... 78

*United States v. Robilotto,* 828 F.2d 940 (2d Cir. 1987) ........................................ 45

*United States v. Rosner,* 516 F.2d 269 (2d Cir. 1975) ............................................ 80

*United States v. Thai,* 29 F.3d 785 (2d Cir. 1994) .................................................. 45

*United States v. Tomero*, 496 F. Supp. 2d 253 (S.D.N.Y. 2007) ............................ 45

*United States v. Torres*, 604 F.3d 58 (2d Cir. 2010) ................................... 44, 51, 59

*United States v. Wolfson*, S1 00-CR-628 (JGK), 2008 WL 1969730

  (S.D.N.Y. May 5, 2008) ........................................................................ 80, 82, 83

*United States v. Zagari,* 111 F.3d 307 (2d Cir. 1997) ............................................. 78

## **Statutes**

18 U.S.C. § 1955 ........................................................................................................ 6

18 U.S.C. § 1961 ....................................................................4

18 U.S.C. § 1962(d) ...............................................................5

18 U.S.C. § 3231 ....................................................................1

18 U.S.C. § 3742 ....................................................................1

18 U.S.C. § 924(c) .......................................................6, 67, 68

28 U.S.C § 1291 .....................................................................1

## Rules

Fed. R. Crim. P. 29(a).............................................................43

Fed. R. Crim. P. 33 ...............................................................78

## **JURISDICTIONAL STATEMENT**

Appellant Bartolomeo Vernace appeals from a final judgment disposing of all charges against him entered by the United States District Court for the Eastern District of New York on May 30, 2014. *United States v. Vernace,* 11-CR-05 (SLT). SPA. 1. Vernace filed a timely notice of appeal on June 12, 2014. A. 755. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether there was insufficient evidence to prove that racketeering acts charging two murders that occurred as the result of a barroom dispute over a spilled drink were related to the charged RICO enterprise?

2.  With respect to a racketeering act charging a conspiracy to distribute, and distribution of, heroin:

     a.  Whether there was insufficient evidence to prove that Vernace engaged in the charged conduct?

     b.  Whether there was insufficient evidence to prove that the charged conduct was related to the charged RICO enterprise?

3.  Whether there was insufficient evidence to support the firearms conviction on Count Two?

4.  Whether a new trial is required because evidence admitted in support of (a) racketeering acts charging two murders; (b) a racketeering act charging conspiracy to distribute, and distribution of, heroin; and (c) a firearms count—all of which was insufficient to sustain the charged conduct—resulted in prejudicial spillover that tainted the jury's verdict as a whole?

5.  Whether the District Court erred in denying a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on the newly discovered evidence that, at the time of his testimony, a crucial cooperating witness was in violation of

a material term of his cooperation agreement by virtue of the fact that he was engaged in an ongoing pattern of criminal activity prior to, during, and following trial?

## STATEMENT OF THE CASE

**A.**     **Nature of the Case and Relevant Procedural History**

**1.**     **Overview**

This appeal stems from a prosecution brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. The principle issue on appeal is the fact that the evidence at trial plainly demonstrates that the most serious charged conduct—two murders that occurred as the result of a barroom dispute over a spilled drink and heroin distribution—were wholly unrelated to the RICO enterprise charged in Count One. In addition, the evidence is similarly insufficient to support the firearms conviction on Count Two.

Accordingly, in addition to reversing the verdicts with respect to the murders, the heroin, and the firearms charges, a new trial is required with respect to the remaining charges because the jury's verdict was tainted due to the prejudicial spillover from the charges requiring reversal. Moreover, a new trial is required in light of the Government's post-trial disclosure that a crucial cooperating witness was engaged in an ongoing pattern of criminal conduct in violation of his cooperation agreement before, during, and subsequent to trial.

**2.**     **Procedural History**

On January 20, 2011, the Government arrested Bartolomeo Vernace based upon an indictment in which Vernace is charged in three counts. In Count One,

4

Vernace is charged with RICO Conspiracy in violation of 18 U.S.C. § 1962(d).  A. 37.

Count One is comprised of nine racketeering acts:

1.     Conspiracy to Distribute and Distribution of Heroin (the "Heroin Charges).  A. 43-44.

2.     Conspiracy to Murder and Murder of Richard Godkin (the "Godkin Murder").  A. 44-45.

3.     Conspiracy to Murder and Murder of John D'Agnese (the "D'Agnese Murder") (the Godkin and D'Agnese Murders are referred to collectively as "the Murders" and the "Shamrock Murders").  A. 45-46.

4.     Illegal Gambling – Video Gambling Machines (the "Video Gambling Charge").  A. 46.

5.     Extortionate Extension of Credit Conspiracy and Extortionate Collection of Credit Conspiracy (the "Loansharking Charge").  A. 46-47.

6.     Illegal Gambling – Baccarat (the "Baccarat Charge").  A. 47-48.

7.     Extortionate Extension of Credit Conspiracy – Baccarat (the "Baccarat Loansharking Charge").  A. 48.

8.     Robbery Conspiracy and Robbery of John Doe #1 (the "Robbery Charge").  A. 48-49.

9.     Extortionate Extension of Credit and Extortionate Collection of Credit – John Doe #2 (the "John Doe #2 Loansharking Charge").  A. 49-50.

In Count Two, Vernace is charged, in violation of 18 U.S.C. § 924(c), with using, carrying and possessing a firearm.  A. 50-51.

In Count Three, in violation of 18 U.S.C. § 1955, Vernace is charged with illegal gambling in connection with video gambling machines, which is based upon the same conduct alleged in Racketeering Act Four.  A. 51.

Vernace was tried before a jury; the Honorable Sandra L. Townes, U.S.D.J. presided.  Trial commenced on March 11, 2013 and, on April 17, 2013, the jury returned a verdict convicting Vernace on all charges.  A. 709-721.

On May 15, 2013, Vernace filed a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 on the ground that there is insufficient evidence to support a conviction with respect to each and every count, with particular focus on the Shamrock Murders and the Heroin Charges.  A. 30.

On May 8, 2014, Vernace filed a motion for a new trial, pursuant to Fed. R. Crim. P. 33, based on evidence—disclosed by the Government on February 14, 2014—that a crucial cooperating witness had violated his cooperation agreement in that he had engaged in a pattern of criminal activity during the period of his cooperation—including throughout Vernace's trial—that continued until at least

November 2013, when he reportedly disclosed his criminal conduct to the Government.  A. 34.

On May 27, 2014, when Vernace appeared for sentencing, the district court denied both the Rule 29 and Rule 33 motions.  A. 724-730.  Following its decision on the motions, the district court sentenced Vernace to a term of life imprisonment on Count One, ten years on Count Two to run consecutively to the sentence on Count One, and five years on Count Three to run concurrently to the sentence on Count One.  A. 741-742.

On June 12, 2014, Vernace filed his notice of appeal.  A. 755.

**B.**　　**The Trial**

**1.**　　**Overview**

The Government's case centers on the claim that Vernace was an associate and later a member of a criminal enterprise (the "Enterprise").  The Government presented its case primarily through the testimony of five cooperating witnesses: (1) Anthony Ruggiano Jr., (2) Milagros Gludau, (3) Howard Santos, (4) Giuseppe Gambina, and (5) Francesco Fiordilino.  In addition, the Government offered testimony from a variety of civilian and law enforcement witnesses who purportedly corroborate the testimony of the cooperators.

The bulk of the evidence at trial related to the Shamrock Murders and the Heroin Charges.  The volume and nature of the evidence regarding those charges

7

had a permeating impact on the entire trial, which otherwise generally involved charges far less menacing in nature.

### 2.    The Shamrock Murders

Richard Godkin and John D'Agnese were co-owners of the Shamrock Bar in Queens, New York.  A. 212, 284.  On April 11, 1981, a dispute arose between two customers over a spilled drink.  A. 63.

By all accounts, the person at the center of the dispute was Frank Riccardi, a young, well-dressed man, having drinks at the bar with his date, who was also well-dressed that evening.  Though known to some at the bar, Riccardi was not a regular at the Shamrock.

According to Douglas Lindberg, an 18-year-old patron at the bar that night, a drink was spilled and a man to his right, who was there with a girl, was upset about it.  A. 59, 63.  Soon after the incident, the man upset by the spilled drink left the bar.  A. 64, 72-73.

As Lindberg recalls, later that evening, there was a scuffle near the front of the bar where D'Agnese had been manning the door.  A. 60, 65.  Subsequently, shots were fired, and Lindberg attended D'Agnese who had been shot in the face. A. 65, 67.  Lindberg also saw Godkin slumped against a wall with a wound in his stomach.  A. 69-70.  Lindberg described the bar as dark and dingy.  A. 72.  He also described the scene as chaotic once the shots were fired.  A. 76.

8

Michael Ray, a 22-year-old patron of the bar that night, recognized an individual named Frank, who was dressed in a suit and accompanied by a well-dressed woman.  A. 77, 79.  Ray knew Frank from other local bars but had not previously seen him at the Shamrock.  A. 77.  Ray described Frank as about five feet nine inches tall, white, Italian, stocky, dark hair, in his late 20's or early 30's.  A. 77.  Ray recalled that the Shamrock was exceptionally crowded—three deep at the bar.  A. 88.

Ray and Frank had a drink or two together and, thereafter, Ray left the bar for a period of time.  A. 79, 86-87.  When Ray left, Frank was still in the bar and Ray had not witnessed him argue with anyone.  A. 87.  When Ray returned, there were ambulances and police cars present.  A. 80.  Ray learned from the crowd that the person with whom he had been drinking had left the bar and returned with two guys and soon after shooting occurred.  A. 84-86.

Patrick Sullivan was the bartender at the Shamrock on the night of the Murders.  A. 214-215.  Sullivan recalled that Riccardi was at the bar with a girl on the night of the Murders.  At some point, Riccardi stepped away from the bar and while he was gone, a drink spilled on the girl's dress, which caused her to make a scene, yelling that her dress was ruined.  A. 219.  According to Sullivan, the person who spilled the drink apologized profusely and bought the girl a drink, which calmed things down until Riccardi returned.  A. 220.

Riccardi responded by yelling at the person who spilled the drink, which prompted D'Agnese to try to calm things down. A. 220. Riccardi reacted confrontationally asking D'Agnese "[w]ell, who are you?" D'Agnese responded "I own this place." Riccardi retorted "[n]o you don't. I run this place." A. 220. Riccardi then took a bottle of vodka, put it next to him and said "[s]ee? This is my place. I do what I want here." At that point, Godkin stepped in and calmed things down. A. 221.

After a while, Riccardi and the girl left, but Riccardi told Sullivan that he would be back. Not long after, Riccardi returned with two men. A. 222. At trial, Sullivan identified the other two men as "Ronnie the Jew" and "Pepe." A. 222. Sullivan testified that he saw "Ronnie the Jew" with a gun and that Riccardi went straight for D'Agnese and grabbed and pushed him. A. 223. Sullivan testified that he saw Pepe pointing a gun at Godkin. A. 224. Sullivan heard a "pop" to his right and then his left and he ducked behind the bar. A. 225-226. The entire incident occurred quickly. A. 227.

Sullivan's testimony at trial, however, was not the first time that he testified regarding the Shamrock Murders, but it is the first time that he identified Vernace as being involved. Initially, when the police questioned Sullivan he claims to have lied when he stated that he did not know who was involved in the Murders, but he maintains that he eventually told the police the truth about what he saw. A. 239.

In 1982, the truth according to Sullivan's testimony in a grand jury was that Ronnie "the Jew" Barlin and Riccardi were the people involved in the Shamrock Murders. A. 260-262. Twenty years later, in 2002, when called as a prosecution witness in a New York State trial in which Vernace was acquitted, Sullivan again identified Barlin and Riccardi as the individuals who had committed the Murders. A. 260-262, 272-275.

Yet, in the 2013 trial of this matter, Sullivan identified Vernace—who he claims to have known as Pepe—as having been involved in the Murders. A. 224. When asked why he apparently lied in his prior testimony, Sullivan said "I don't know. It just seemed like two men were dead over a spilled drink. I think that was reason enough to be afraid." A. 239.

Sullivan, however, acknowledged that no one approached him or threatened him prior to his testimony in the grand jury in 1982 or his trial testimony in 2002. A. 242, 269. Moreover, Sullivan testified that, prior to his testimony in 2002, he had not seen Vernace since 1981. A. 240-241. Nevertheless, despite the fact that no one ever threatened or even approached Sullivan, and notwithstanding that he had not so much as seen Vernace in more than 20 years, he claims to have lied at Vernace's 2002 trial because he was afraid and did not want to involve himself. A. 242. His fear notwithstanding, he identified Riccardi and Barlin in 1982 and 2002.

11

Jean Wells—another patron at the Shamrock Bar on the night of the Murders—testified that in 1981, she was an 18-year-old NYU student living in Ozone Park. A. 282. At the time, she frequented the Shamrock Bar with her friends, including Linda Gotti. A. 282. Wells testified that she knew D'Agnese, who lived around the corner from her, and that he was dating Linda Gotti. A. 285-286.

According to Wells, Doug Lindberg—whom she had known for a long time—spilled a drink on someone at the bar and the person made a big deal about it. A. 288. According to Wells, Lindberg spilled the drink on a man and D'Agnese—who was seated at the bar near where the incident occurred—told the man to "[c]alm down. Just calm down. We'll get it dry-cleaned for you. Just stop." A. 305. Later in the evening, the man again began to argue with Lindberg about the spilled drink and D'Agnese again came to calm things down and asked the man to leave immediately, which the man did. A. 306.

Wells had never before seen the person with whom Lindberg argued. A. 288. At some point after the argument, the man with whom Lindberg argued left the bar with a woman and later returned with two men. A. 289-290.

When the men walked into the Shamrock, D'Agnese approached them but was pushed down and the man who had argued with Lindberg shot D'Agnese in the face. A. 291-292. When D'Agnese was shot, the patrons rushed toward the

12

back of the bar as Godkin ran to the front toward D'Agnese with what looked like a gun in his hand.  A. 292, 307.

By that point, D'Agnese was lying on the floor and Lindberg and Linda Gotti were wiping his face and talking to him.  A. 294.  Godkin had gone to the back of the bar but Wells could not tell what his condition was at the time.  Some time thereafter the police arrived and questioned Wells and many others present at the time.  A. 297.  Wells later went with Linda Gotti to the hospital where they learned that D'Agnese was dead.  A. 298.

Wells recalls that she was asked whether she could identify the assailants but indicated that she did not believe that she could.  A. 298.

Some months after the murders, Wells was with her boyfriend—Bobby Lavardara, a DJ who worked at the Shamrock on the night of the Murders— playing darts at a bar.  A. 300.  At the bar, Ronald "Ronnie One Arm" Trucchio— whom Wells knew from her neighborhood because she "just saw him all the time"—came in and spoke to Lavardara for a few minutes.  A. 298-300.

Lavardara then called Wells to join them and Trucchio asked her "[w]hich Gotti [do] you hang out with?"  A. 300.  Wells responded that she and Linda Gotti were friends.  A. 300.  Trucchio then asked Wells if she knew the name of Linda Gotti's father to which she responded "I don't know her father's name.  I've

13

always just called him Mr. Gotti. . . . She lives around the corner from me." A.

301.

Wells testified as to the remainder of their conversation as follows:

He said, "You went to see the ADA this week?"

And I said, "Yes."

And he said, "Okay. How you doing?"

I said, "Okay."

He said, "Good girl." And he walked away, walked out.

A. 301. In response to the Government's question as to how she was feeling at the

moment that Trucchio departed, Wells testified that she was curious:

> **I was curious how he knew** [that I went to see the ADA]. I didn't
> know how he knew that I saw him, and **I was wondering why he
> wanted to know which girl I was hanging out with that night**. And
> that was it. **It was more curiosity than anything else**.

A. 301-302 (emphasis supplied). Apparently dissatisfied with its witness's

response, the Government pressed Wells, and she acknowledged that she had

previously indicated that she had felt scared at that moment. A. 302. Nonetheless,

when the Government asked whether she had an understanding of who Trucchio

was, Wells testified that she did not. A. 299.[1]

---

[1] According to cooperating witness Anthony Ruggiano, at the time of the murders,
Ronald Trucchio was an associate of the Enterprise in Fat Andy's crew. A. 102,
147, 149-150.

Regardless of how she may have felt, Trucchio never had any other conversations with Wells again.  A. 303.  Moreover, he never asked Wells what she had discussed with the A.D.A. or indicated that Wells should not speak to the A.D.A. or to anyone else – the only thing that he said was "good girl."  A. 303.

Anthony Ruggiano, an admitted mob associate for 37 years prior to his cooperation, A. 93-94, also testified about the Shamrock Murders.   In particular, Ruggiano testified that he conspired to kill Frank Riccardi because he had shot and killed two people in the Shamrock bar without approval from the hierarchy of the Enterprise.  A. 98, 101, 204-205.

According to Ruggiano, Riccardi, whom he knew for about ten years as of 1981, was an associate of the Enterprise.  A. 98, 101.  Reportedly, in early 1981, Riccardi came to the "Polish Bar" and informed Ruggiano that Vernace—whom he referred to as "Bobby Glasses"—Ronald "Ronnie the Jew" Barlin, and Riccardi shot two people.  A. 101.

Ruggiano's father, known as "Fat Andy," was an influential soldier in the Enterprise who ran a large crew.  A. 128-129, 132.  The Polish National Bar in Ozone Park (a.k.a., the "Polish Bar") is the location at which members of Fat Andy's crew congregated at that time.  A. 157.

Ruggiano testified that Riccardi, Barlin, and Vernace had been associates in Fat Andy's crew but that in the 1970s—prior to the Murders—Vernace and Barlin

15

joined another crew. A. 131-135, 171. According to Ruggiano, Vernace left Fat

Andy's crew as part of a mass exodus with others loyal to another member of the

Enterprise who had been given his own crew. A. 154-156. Riccardi, however,

remained in Fat Andy's crew. A. 159.

Ruggiano recalls that he was talking with his brother outside the Polish Bar

when Riccardi approached him. A. 160. Ruggiano and Riccardi were both in Fat

Andy's crew. When Riccardi approached Ruggiano, he looked "very nervous" and

told Ruggiano that he needed to speak with him. A. 160. According to Ruggiano,

he and Riccardi entered the Polish Bar and Riccardi explained that Riccardi "had a

beef in the bar" and—rather than going to the Polish Bar where his fellow crew

members congregated—Riccardi went to another location and found "Bobby

Glasses and Ronnie the Jew and they went back to the bar and they shot two guys."

A. 160-162.

Interestingly, as Ruggiano explains it, he was not initially disturbed by news

of the Murders but rather by the fact that Riccardi went to someplace other than the

Polish Bar for assistance:

> Q:  Now, when [Riccardi] said that he had gone to JoJo's club on
> 77th Street, did you have any reaction to that?
>
> A:  Yes, I said, what do you mean you went there? What should
> you go there for? **You know you're not supposed to go there**.
>
> And then [Riccardi] said, oh, I'm sorry.

16

A. 162 (emphasis supplied).

As the conversation progressed, Riccardi reportedly informed Ruggiano that Linda Gotti—daughter of Peter Gotti and niece of John Gotti—was present in the Shamrock when the shooting occurred. A. 162-163. Subsequently, Ruggiano learned that Linda Gotti had "made an identification and a statement" to law enforcement regarding the shooting in the Shamrock, which was problematic because people affiliated with organized crime are "taught not to help law enforcement at all." A. 166.

Approximately a week after the shooting, a meeting was held at the Polish Bar that was attended by Fat Andy, John Gotti, Peter Gotti, Gene Gotti, and other reputed members of the Enterprise; indeed, other than Peter Gotti, who was an associate at the time, all attendees were inducted members of the Enterprise. A. 167-169.

John Gotti was unhappy about the unsanctioned Shamrock Murders—in fact, he said "that it was a horrendous thing that this guy killed two people for no reason." A. 211. When the meeting concluded, Fat Andy informed Ruggiano that Riccardi had to be killed for his actions in the Shamrock Bar. A. 169.

Ruggiano explained that the Gottis had come to Fat Andy to discuss killing Riccardi because Riccardi was a member of Fat Andy's crew and other members of the Enterprise could not kill him without Fat Andy's permission. A. 170.

17

Neither Bobby Glasses nor Ronnie the Jew were discussed at this meeting because—as Ruggiano put it—"we had nothing to do with Ronnie the Jew and Bobby Glasses.  They weren't with us."  A. 171.

> Fat Andy readily agreed with the proposal to kill Riccardi:

> A: Because at that point **he was very unhappy with [Riccardi]**, and **he didn't like what he did**.  He didn't like the whole incident.  He said it was not a nice thing that he did, and he caused a lot of trouble for everybody.

> Q: When you say it "caused a lot of trouble," what did you understand that to mean?

> A: Well, **he caused a lot of trouble for innocent people** and for the Gottis.

A. 171 (emphasis supplied).

Ruggiano testified that Fat Andy responded with a reaction of disgust to the Shamrock Murders.  A. 203.  Fat Andy was disgusted that Riccardi had done "his normal routine of getting drunk and starting trouble . . . ."  A. 204.  Despite the fact that Riccardi was an associate in Fat Andy's crew, Riccardi did not follow the requisite protocol of putting on record in advance his intention to commit the Shamrock Murders.  A. 204.

According to Ruggiano, the Enterprise has a protocol for sanctioning a murder, which requires that a request to commit a murder "go right up the chain to the boss himself . . . whose power is absolute and is the only one in the [Enterprise]

18

that has the authority to authorize a murder and commit it on behalf of the enterprise." A. 205.

In contrast to the Shamrock Murders, Ruggiano described the process that occurred when the Enterprise sanctioned his request to murder his brother-in-law. According to Ruggiano, he first requested permission from his incarcerated father to bring the request to another member of the Enterprise, which was approved. The soldier to whom Ruggiano made the request in turn forwarded the request to his captain, who thereafter brought the request to the boss, who ultimately approved it. A. 208-209. Importantly, no action was taken until the request was approved. A. 209.

Ruggiano testified that in accordance with the plan to kill Riccardi, he attempted to lure Riccardi to a diner with a ruse about settling a loansharking matter. At the time of the meeting, however, Riccardi's uncle arrived in his stead. The uncle told Ruggiano that he was not going to permit anyone to kill his nephew and that from that point forward the uncle would handle the matter with Fat Andy. A. 172-173. Ruggiano never saw Riccardi again. A. 174.

As for Vernace, Ruggiano did not see Vernace following the Murders, but years later, he reportedly saw him at John Gotti's club, the Ravenite, and at Gotti's Christmas party. A. 175-176.

### 3.     The Heroin Charges

Louis Diaz, a retired undercover Drug Enforcement Administration agent,

testified regarding his work as an undercover narcotics dealer in a 1981 heroin

distribution investigation.  A. 308-309.  The investigation led to the arrests of

Bruce Erbacher, Herbert Frank, Anthony Cuccio, Ronald Barlin, Pauline Frank,

George Glecker, and Milagros Fantauzzi.  A. 310.

Through a confidential informant, Diaz arranged an introduction to

Erbacher, and Diaz posed as a heroin dealer from Philadelphia in need of a new

source of supply.  A. 314-315.  Erbacher informed Diaz that he had suppliers who

were "well organized," which Diaz understood to mean "Italian Mafia, organized

crime . . . ."  A. 316.  Diaz explained that he drew his conclusion from the word

"organized" because "that was really the main label that was affiliated with Italian

Mafia families, organized crime."  A. 316.

Diaz purchased heroin from Erbacher a few times before he was introduced

to Herbert Frank.  A. 317.  Diaz and Herbert Frank met in Erbacher's apartment on

East 10th Street to discuss a heroin transaction.  A. 318.  Diaz told Herbert Frank

his story about being a dealer in Philadelphia in need of a new source of supply,

and Herbert Frank told Diaz that he had a source that was "well organized."  A.

318.  In response to Herbert Frank's description of his source as "well organized,"

Diaz reportedly said, "connected.  Family" to which Herbert Frank replied, "you got it," which Diaz understood to mean "Italian Mafia."  A. 318-319.

As their relationship progressed, Erbacher told Diaz that Diaz would be able to meet his suppliers, whom he identified as Ron and Pepe.  A. 321.  Diaz, however, does not recall having recorded this information in his notes of the investigation; asking Erbacher to attempt to arrange a meeting with Ron and Pepe; or taking any steps to learn the identities of Ron and Pepe.  A. 346-348, 353-354. In fact, prior to the arrest of Herbert Frank—discussed below—there is no mention of the name Pepe in any report from the investigation.  A. 350, 358-362.[2]

Diaz attempted to make a large purchase from Erbacher but when Erbacher was unable to obtain the product, Diaz decided to arrest Erbacher in the hope that Erbacher would cooperate.  A. 321.  Erbacher did agree to cooperate and helped Diaz arrange a meeting at Herbert Frank's apartment in an effort to obtain heroin. A. 322.

Armed with a warrant to arrest Herbert Frank, Diaz and Erbacher went to Frank's apartment.  A. 323.  When they arrived, Herbert Frank was not present, but

---

[2] At the trial of Herbert Frank, *et al.*, Erbacher appeared with a lawyer prepared to testify that he never mentioned the names Ron and Pepe to agent Diaz but for reasons that are unclear he did not testify at that trial.  At the time of the trial of this matter, Erbacher was deceased and the district court did not permit Vernace to elicit from Diaz his knowledge of Erbacher's intended testimony.  A. 354-357.

his wife Pauline Frank, Barlin, and Cuccio were in the apartment. A. 324. Cuccio had a bandage on his head from a gunshot wound he had recently suffered. A. 324.

In the apartment, Diaz found heroin, weapons, money, and a scale. A. 325. Diaz arrested Pauline Frank, Barlin, and Cuccio. Subsequently, the telephone rang and when Diaz answered the caller asked to speak with Herbert Frank. When informed that Herbert Frank was not present, he asked to speak with Pauline. A. 327. Diaz remained on the line and had Pauline pick up the call from another extension.

The caller identified himself as Pepe and asked "if everything was okay," and Pauline said yes. A. 327. The caller then asked if Cuccio was present and if he could speak with him. When Cuccio picked up the phone, the caller asked again if everything was okay, and Cuccio said "no." At that point, they both hung up. A. 327. Notably, the caller did not ask to speak to "Ron." A. 345.

Subsequently, Herbert Frank, Milagros Fantauzzi, and George Glecker arrived at the apartment and were arrested. Frank possessed approximately $50,000 and Fantauzzi had a half-kilogram of cocaine. A. 328-329. At the time of the arrest, Barlin had $2.80. A. 344. Though Diaz was unable to identify Pepe, the indictment of the others included "John Doe, a/k/a "Pepe," but Pepe was never arrested. A. 330.

22

Interestingly, despite being an experienced DEA agent and contrary to DEA policy, Diaz destroyed his notes from the investigation even before the trial of Herbert Frank, *et al.* A. 341-342.

Milagros Gludau (formerly Fantauzzi) also testified regarding the Heroin Charges. Gludau came to this country illegally from the Dominican Republic. A. 366. Gludau was arrested with Herbert Frank and others and convicted of conspiring to distribute heroin in 1981 for which she was imprisoned for six months. A. 368. In addition to her involvement in drug dealing while she was an illegal alien, Gludau also worked as a prostitute. A. 368.

In 2000, Gludau was deported to the Dominican Republic as the result of her 1981 heroin conviction but after only a year she returned to the U.S. illegally, which she accomplished with a fake passport and bribery of airport officials. A. 369-371, 400.

On December 9, 2010, FBI agents confronted Gludau about her illegal reentry into this country. A. 371. Gludau waived her rights and agreed to speak to the agents. Eventually, Gludau obtained a lawyer, entered a cooperation agreement, and, on February 14, 2013, pleaded guilty to illegal reentry. A. 371-372. At the time of her testimony, she had not been sentenced.

In 1981, Gludau lived in Queens with her then-husband Charles Fantauzzi and their two children but was having an affair with George Glecker. A. 372.

23

According to Gludau, Glecker used cocaine regularly and was a drug dealer who sold marijuana and cocaine. A. 375-376. Gludau accompanied Glecker on trips to deliver and purchase drugs in New York, Mexico, California, Florida, and Seattle. A. 376.

In New York, Glecker worked with "Herbie and Bruce." A. 378. Gludau testified that she was present for conversations between the three regarding drugs and money. A. 378. Gludau also claims to have heard the names "Pepe and Ron," but she does not remember ever seeing them. A. 379.

On one occasion, Gludau was in Herbert Frank's apartment for dinner. During the course of the evening, two men came to the apartment, went into the bedroom with Herbert Frank, and left after 15 to 20 minutes. A. 380-381. When the bedroom door opened, Gludau claims to have seen three or four guns on the bed. When the men left the bedroom, the shorter man, who was wearing glasses, said goodnight to Gludau as he passed where she was sitting on the couch. A. 381-382.

Not long after that evening, on May 13, 1981, Gludau was arrested at Herbert Frank's apartment when she accompanied Glecker to meet Herbert Frank to purchase drugs. A. 380, 387-388. Gludau claims that she was holding cocaine in her purse for Glecker at the time of the arrest. A. 386-387.

When shown a 1993 photograph of Vernace, Gludau identified him as the shorter man with glasses who came to Herbert Frank's apartment when she was there for dinner in 1981. A. 389. Gludau, however, acknowledged that it took only "a second" for the man to walk from the bedroom out of the apartment and that that was the only time that she had ever seen the individual. A. 410.

Gludau, however, was unable to identify a photograph of Ronald Barlin or Anthony Cuccio. A. 390-391, 405. Notably, in the photograph of Cuccio, his head is still bandaged as the result of his gunshot wound. A. 405. Moreover, not only could Gludau not identify Cuccio, she had no recollection of his presence in the apartment on the day she was arrested or from anywhere else. A. 405-406.

Indeed, Gludau did not recall Cuccio with his bandaged head or Barlin being in the apartment at the time of their arrest, at any of her pretrial appearances in her criminal case, or as her co-defendants during their two-week trial. A. 406-409. She similarly did not recall the name of her co-defendant Pauline Frank or the fact that Pauline Frank testified in pretrial hearings. A. 409. She also had no recollection of anyone named Ron being involved in her trial or mentioned at her trial. A. 412-413.

It is, however, undisputed that when Gludau was arrested, Herbert and Pauline Frank, Ronald Barlin, and Anthony Cuccio were present in the apartment with her. A. 683. Additionally, also undisputed is the fact that all of those

25

individuals were charged together; attended pretrial proceedings together, including four days of hearings at which Pauline Frank testified; and were defendants in a two-week trial at which they were each present on every day.  A. 683-684.

Annette Frank—the daughter of Herbert and Pauline Frank—testified in connection with the Heroin Charges.  Annette Frank was 12 or 13 when her parents were arrested but was aware that her father was involved with illegal drugs and had seen guns in their apartment.  A. 416-419.

Annette Frank identified Barlin as a friend of her father who was in their apartment regularly.  A. 419-420.  She also indicated that Cuccio was her father's friend and that he visited their apartment.  A. 421.  She recalled that Cuccio had a head wound from a gunshot that her mother had bandaged.  A. 423.  Annette Frank described Erbacher as a strung out alcoholic who was not like the others.  A. 423.  She described Gludau as "like [Erbacher], didn't seem all right like everyone else."  A. 425.

When shown a photograph of Vernace, Annette Frank indicated that the person "looked familiar," but she acknowledged that she could have previously seen a photograph of the person in the news and she was uncertain as to where she had seen him before.  A. 426-428.  Further, she had no recollection of ever having seen him at her parents' apartment.  A. 428.

### 4.      Organized Crime Rules and Associations

The Government presented cooperating witnesses Anthony Ruggiano,

Howard Santos, Giuseppe Gambina, and Francesco Fiordilino as authorities on

organized crime.

Ruggiano testified that he had been an associate of the Enterprise for 37

years, from 1969 until 2006 when he cooperated with the Government.  A. 93-94.

Ruggiano testified that his father, an inducted member of organized crime, began

to educate him at age 15 and that by 16 he was an organized crime associate.  A.

106-107.  Ruggiano learned the rules of organized crime from his father and others

and from living the life.  A. 125-126.

Ruggiano explained that the Enterprise is one of five organized crime

families in New York, and that its purpose is to make money.  A. 112-114.  The

hierarchy of the Enterprise, referred to as the administration, consists of a boss, an

underboss, and a consigliere.  A. 114.  According to Ruggiano, the boss sets

policies and rules, makes final decisions, and has total control—or, as Ruggiano's

father would say "the boss is the boss, is the boss."  A. 115.  The underboss is the

boss's right-hand-man and is responsible for the captains, and the consigliere

"keeps the peace."  A. 115.

Under the three leadership positions are captains, who run crews comprised

of soldiers and associates.  A. 121.  A captain is responsible for his crew and

27

reports to the administration. A. 121. A crew is a group of individuals who commit crimes together. A. 123. Though a captain generally runs a crew, a soldier or an associate can also run crews of their own. A. 123. Soldiers report to captains, and associates typically report to soldiers but sometimes report to other associates. A. 121-123.

Ruggiano identified individuals in numerous photographs and specified their ranks and affiliations with organized crime. *See, e.g.,* A. 179-185, 188-191. According to Ruggiano, he met Vernace in the early 1970s and Vernace—whom he referred to as "Bobby Glasses" because he does not know his last name—was also affiliated with the Enterprise. A. 94-95. According to Ruggiano, Vernace was inducted as an official member of the Enterprise in 1999. A. 187.

Prior to the 1970's, in order for an associate to be officially inducted into an organized crime family he had to commit murder. A. 123-124. After the murder requirement was discontinued, an associate could be inducted for being a good earner. A. 124. Ruggiano, nonetheless, testified that killing someone puts an associate on the "fast track" to becoming an inducted member of the Enterprise. A. 151. Ruggiano explained that killing someone is referred to as "doing work," which in organized crime is viewed positively. A. 124. Someone willing to commit murder is referred to as "capable." A. 125.

Ruggiano discussed the importance of one's reputation in organized crime: reputations earn respect, which leads people to want to do business with you, which leads to earning more money and having more "juice," or power. A. 124-125. Ruggiano testified, however, that Fat Andy explained to a newly inducted member that indiscriminate violence to resolve personal disputes is not permitted. Thus, the new member was told that "if he had any vendettas with anybody, he had to let them go. He couldn't take advantage of anybody once he got made." A. 151.

Ruggiano also testified as to the meaning of certain terms, such as "stand-up-guy," which he defined as someone who would not cooperate with the government, and "La Cosa Nostra," which he defined as the mafia. A. 108, 112. According to Ruggiano, being "on record" means that you are connected with an organized crime family. A. 123.

Among the rules that he learned are that you are not permitted to be involved with the wife of a member of organized crime, you are not permitted to sell drugs, you are not allowed to kill without permission, and to be inducted your father must be Italian. A. 126. Ruggiano, however, acknowledged that the rules are frequently broken and violations are not always punished. A. 126-127.

Though Ruggiano claimed violations of Enterprise rules frequently are not punished, he nevertheless sought to conceal his own transgressions. Ruggiano

29

testified that he sold between 10,000 and 15,000 barbiturates but that the

Enterprise was unaware of this activity.  A. 198.  Ruggiano indicated that he

specifically decided not to put his drug dealing on record with the Enterprise

because selling drugs is against the rules.  A. 198.

Indeed, according to Ruggiano, his sale of barbiturates was a crime that he

committed that was not part of the Enterprise because it violated the rules.  A. 198-

199.  Ruggiano also conducted an off-record marijuana and cocaine distribution

business that was concealed from the Enterprise.  A. 202.

Ruggiano similarly concealed his possession and use of drugs from the

Enterprise because of the prohibition against drugs—in other words, he committed

the crimes of drug use, possession, and sale "for his own use" and not "for the

benefit of the enterprise."  A. 199.  Ruggiano also committed other crimes—such

as robbery—to further his drug habit, which were unrelated to the Enterprise.  A.

201-202.

Despite his lineage and long association with organized crime, Ruggiano

was twice proposed for membership but never inducted.  A. 129-130.

Howard Santos testified that he was an associate of the Enterprise since

1979 when he was 15 until 2009 when he began cooperating.  A. 429-430.

According to Santos, the primary purpose of the Enterprise is to make money.  A.

441.  Santos also testified regarding the structure of the Enterprise, the various

30

positions within the Enterprise, and the meaning of certain terminology.  A. 441-445.

Santos identified Vernace as an associate of the Enterprise who was inducted as an official member in 1999.  A. 431, 438.  Santos claims to have known Vernace since the 1980s and to have known him as "Bobby Glasses."  A. 432. Santos testified that from approximately 1982 until the middle 1980s, he did not see Vernace, whom he understood was in hiding.  A. 453-454.  When Vernace reappeared, Santos learned that no one was supposed to refer to him as Pepe—only as Bobby.  A. 455.  According to Santos, Vernace informed him that another associate of the Enterprise had a relationship with members of the Japanese community that helped Vernace while he was in hiding in the early 1980s.  A. 456-457.

Santos also testified generally to Vernace's involvement with gambling and loansharking operations and some other associated criminal conduct that was admitted as proof of the Enterprise and of Vernace's membership in the Enterprise. A. 458-486.  Santos, however, was a member of a crew run by another member of the Enterprise, whom he credits with teaching him the ways of organized crime. A. 441.

According to Santos, a "capable guy" is someone willing to kill, which is considered desirable.  A. 444.  An associate becomes a member of the Enterprise

by demonstrating his worth either through acts of violence or an ability to earn money for the Enterprise.  A. 444.  In this regard, Santos discussed "scoring points," which he described as "doing things to get noticed, you know.  Violent things.  Big Robberies.  Anything, anything to get the attention of The Administration or whoever you might be with."  A. 488.

In discussing his own crimes, Santos described a shooting that resulted from a personal dispute in which he was involved.  According to Santos, though the Enterprise neither sanctioned it nor profited from it, the incident boosted Santos's reputation because it proved he was capable of violence and earned him respect on the street.  Tr. 1181-85; *see also* A. 489-496 (discussing acts of violence that he claimed bolstered his reputation).  Santos further explained that when you have respect, people are afraid of you and you are better able to earn money for the Enterprise, and—if you are Italian—it can lead to becoming an inducted member of the Enterprise.  A. 488.

Nevertheless, Santos acknowledged that he committed acts of violence that the Enterprise neither condoned nor praised.  For example, in one instance, in an act of personal vengeance, Santos stabbed an individual outside of an establishment controlled by a member of the Enterprise.  As a result, the individual who owned the establishment punched Santos in the mouth and knocked out one of his teeth.  A. 518.  Thus, contrary to Santos's claims about the benefits of

32

committing violent acts, his indiscriminate act of violence for personal vengeance did not result in being praised as a tough-guy—he was chastised and beaten.

Regarding drugs, Santos testified that though the Enterprise prohibits selling drugs, the "rule is basically don't get caught." A. 446. Santos mentioned a number of people, including himself, who were affiliated with the Enterprise and sold drugs. Santos further indicated that none of the people whom he mentioned was ever punished by the Enterprise for drug dealing. A. 446-447.

Santos, nevertheless, acknowledged that an associate can commit crimes that are not related to the Enterprise. Indeed, Santos acknowledged that he committed many crimes in the course of his association with the Enterprise that had nothing whatsoever to do with the Enterprise; rather, they were crimes that he did for his own motivations. A. 520.

Thus, Santos went through a litany of crimes that he had committed, some of which he claimed were related to the Enterprise and others, including arsons, that were not. A. 449-450. In fact, Santos committed crimes, such as burglaries and home invasions, that he kept secret from the Enterprise to avoid having to share any of the proceeds. A. 497-498, 519.

The Government also called Giuseppe Gambina—an associate of another enterprise who was proposed for membership but never inducted. A. 521.

Gambina testified that he met Vernace in 1991 and that Vernace became an inducted member of the Enterprise in 1999.  A. 521, 531, 534.

Gambina also testified generally regarding organized crime structure and his knowledge of various individuals he claimed were associates and members of organized crime.  A. 527-531, 535-537.  Gambina testified that in organized crime, the boss makes the decisions.  A. 588.  Gambina testified in particular that an order to kill can only come from the boss.  A. 595-596.

As an associate, Gambina was required to inform the soldier to whom he reported about all of his criminal activity in advance of his actions.  A. 588-589.  The solider in turn reported to his captain about the criminal activity of Gambina and the other associates who reported to the soldier.  A. 589.  The captain then reported to the boss, underboss, and consigliere all of the activity of his underlings.  A. 589.

Despite these requirements, however, Gambina at times committed crimes for his own benefit that he did not report to his superiors—"these were crimes that [he] committed for [his] own personal reasons."  A. 590.  Thus, despite the rule against drug dealing—which Gambina testified is punishable by death—Gambina sold cocaine and heroin without reporting it to anyone in the enterprise with which he was affiliated and kept the money for himself.  A. 537-542, 592-593.

In addition to his drug dealing, among the many other crimes about which Gambina testified having committed was an assault in which he put a man in a coma by beating him with a hammer. A. 543-555. According to Gambina, his use of violence gave him more respect on the street. A. 567. It did not, however, enable him to achieve his goal of becoming an inducted member of an organized crime group.

The Government also called Francesco Fiordilino—another lifelong associate of organized crime who never made the cut to join the ranks of officially inducted members—to testify as an authority on organized crime. Fiordilino discussed at length his own family's roots in organized crime, including an uncle who at one time was an acting boss, and cousins who were inducted members in organized crime families. A. 604-605, 619-621.

Fiordilino also discussed his own affiliations with various crews, the soldiers to whom he reported, as well as the structure and hierarchy of organized crime. A. 626-631. Fiordilino claims to have been an associate for more than 20 years, from age 12 until he cooperated in 2002. A. 600, 614-615. Fiordilino identified the five New York families; defined terms such as "the life," an "acting" position, "kicking up," and being "around" someone. A. 617-621, 624-625. Fiordilino described someone who is "capable" as a person prepared to commit murder and other acts of violence. A. 635-636.

According to Fiordilino, being capable is a valued trait particularly because murder used to be a prerequisite to admission into organized crime, and though no longer required is still a reliable means of induction. A. 633-634, 636. Accordingly, Fiordilino testified that he sought an opportunity to kill someone to prove that he was capable and to gain respect. A. 643-644.

Toward that end, in 1993, Fiordilino sought permission from his uncle, who was his organized crime superior, to kill Thomas Sajn. Fiordilino wanted to prove himself to his uncle and to make his uncle aware that he was capable of that level of violence. A. 646. Fiordilino told his uncle a story that he had concocted about Sajn having disrespected Fiordilino—he did not dare reveal his true motivation, which was to steal drugs from Sajn—but his uncle denied permission and chastised Fiordilino for being quick to resort to violence to resolve a personal problem. A. 647, 672-673.

Intent on proving himself, Fiordilino nonetheless recruited two other individuals to lure Sajn with the promise of a lucrative drug deal. When Sajn arrived, Fiordilino shot him in the back of the head and his accomplices stole the drugs that Sajn had brought. A. 649.

When his uncle learned about the murder and confronted him, Fiordilino admitted that he had killed Sajn but never confessed that he had stolen several

kilograms of cocaine as part of the murder because he feared "strong repercussions" if his uncle knew about the drugs. A. 674-676.

As a reward for proving himself capable of murder, Fiordilino's uncle—who had not authorized the Sajn murder—punched Fiordilino in the mouth and refused to help him get a job, telling him instead that he should collect cans if he had to earn money. A. 653-654, 677-678. Thereafter, his problems with his uncle led Fiordilino to be transferred to another crew. A. 677-678.

Nonetheless, Fiordilino claimed that the Sajn murder increased his respect on the street. A. 656. Be that as it may, despite having murdered Sajn in 1993, at the time of his arrest in 2002, Fiordilino was not an inducted member but rather remained an associate who worked serving coffee and as a doorman at social clubs at which card games were held. A. 678-681, 682.

Though never inducted himself, Fiordilino described the induction process and the rules of organized crime. A. 634, 636; Tr. 2341. Consistent with the other Government witnesses, Fiordilino acknowledged that drug dealing is prohibited but explained that it is a rule that is frequently violated—though some, including his uncle, take the rule against drug dealing extremely seriously. A. 635-638.

**5.    Cooperation Agreements**

The Government elicited evidence about cooperation agreements to demonstrate that the agreements function in essence as guarantors of the truthfulness of cooperating witnesses.

Thus, Ruggiano testified that he cooperated in 2006 after he was arrested for murdering his brother-in-law for which he faced life in prison. A. 192. Ruggiano admitted that he was motivated to cooperate to avoid spending the rest of his life in prison. A. 192. Ruggiano entered a cooperation agreement under which he is obligated to "provide information about myself and others, to testify when asked and to give all truthful information." A. 196. In exchange for his cooperation, the Government agreed to write a letter to the sentencing Court outlining his cooperation. A. 196-197. If, however, Ruggiano were to violate his cooperation agreement, he would not be allowed to withdraw his guilty plea and would face a life sentence. A. 197.

Milagros Gludau also testified about her decision to cooperate and her cooperation agreement. A. 391-394, 414. Gludau explained that at the time of her cooperation, she faced a 20-year sentence for illegal reentry into the United States. A. 394. Her decision to cooperate was based upon her desire to avoid the consequences of her immigration crime. A. 391.

Her cooperation agreement requires her to tell the truth and to testify if requested. A. 395. In exchange for her cooperation, Gludau is entitled to an S-Visa that enables her to remain in this country. A. 409. If, however, Gludau were to lie in her testimony, it is her understanding that she would "go to jail and everything, the agreement, everything will be destroyed." A. 396. According to Gludau, if she violates the agreement, she would face 20 years imprisonment for illegal reentry and would be deported. A. 396.

Giuseppe Gambina testified regarding his cooperation with the Government. A. 586. When he pleaded guilty, he faced a maximum penalty of 20 years imprisonment. A. 586. His cooperation agreement requires him to tell the truth about all of the crimes that he committed, to meet with the FBI, and to testify as needed. A. 587, 597. If Gambina honors his obligations under the agreement, the Government is obliged to make a motion to the sentencing Court for a reduced sentence based upon his cooperation. Tr. 2039. Should Gambina violate his agreement, however, he is subject to the full penalty for the crimes to which he pleaded guilty. Tr. 2040.

Fiordilino testified that his cooperation agreement required him to tell the truth, admit all of his crimes, and to testify. A. 664-665. The maximum sentence that Fiordilino faced was life but—according to Fiordilino—under the cooperation agreement "it didn't matter it was all based on the recommendation from the

39

AUSA." A. 666. Ultimately, based upon a letter from the Government and a Government request at the time of his sentencing, Fiordilino received a sentence of time served, which amounted to five years and nine months for a lifetime of crime, including murder. A. 666-667.

**C.** **Fiordilino's Violation of His Cooperation Agreement**.

On February 14, 2014, the Government disclosed that one of its crucial cooperating witnesses, Francesco Fiordilino, commencing in approximately 2010, engaged in a pattern of criminal activity during the period of his cooperation— including throughout Vernace's trial—that continued until at least November 2013, when he reportedly disclosed his criminal conduct to the Government. A. 745.

According to the Government, Fiordilino's criminal conduct included the following:

> Fiordilino disclosed that he had been engaging in illegal gambling activities and collecting illegal gambling debts on behalf of others to whom he (Fiordilino) himself owed gambling debts. Fiordilino made the disclosure because he feared for his safety because of his inability to satisfy his debts. In a subsequent interview with the Federal Bureau of Investigation, Fiordilino disclosed that he had been engaged in illegal gambling activities since approximately 2010.

A. 745.

Moreover, though Fiordilino had already been sentenced at the time of his testimony at trial, his obligations pursuant to his cooperation agreement had not ceased. A. 746-754.

40

## SUMMARY OF THE ARGUMENT

The Shamrock Murders are unrelated to the Enterprise and the evidence is, therefore, insufficient to support the jury's verdict. The fact that individuals associated with a criminal enterprise commit a crime is insufficient to render it related to the enterprise. Moreover, absent the element of relatedness, the Shamrock Murders do not qualify as racketeering acts and, therefore, are not prosecutable in federal court. Thus, given that Vernace was tried and acquitted in state court for the Shamrock Murders, the requirement that the Murders are related to the Enterprise is all the more critical in light of due process concerns and principles of double jeopardy.

There is also insufficient evidence to support the Heroin Charges. First, there is no meaningful evidence that Vernace was involved in the heroin distribution conspiracy. Second, the Heroin Charges are unrelated to the Enterprise. As with the Shamrock Murders, the mere fact that individuals associated with an enterprise engage in criminal conduct is insufficient to satisfy the relatedness requirement. The evidence is clear that heroin distribution is prohibited by the Enterprise and there is no evidence that the Enterprise was aware of the charged conduct or benefitted from it. There is similarly no evidence that the participants were able to commit the charged conduct solely by virtue of their

41

positions in the Enterprise.  The evidence is, therefore, insufficient to support the Heroin Charges.

The evidence is also insufficient to support the firearms violation.  Given the insufficiency of the evidence in support of the Shamrock Murders and the lack of any other evidence that Vernace engaged in a crime with advance knowledge that a firearm would be involved, the charge cannot be sustained.

The evidence admitted in support of the Shamrock Murders, the Heroin Charges, and the firearms charge is inflammatory and undoubtedly incited the jury to convict Vernace on the remaining charges.  Accordingly, a new trial on the remaining charges is required.

A new trial is also required in light of the evidence that—at the time of his testimony—a crucial cooperating witness was engaged in ongoing illegal conduct in violation of his cooperation agreement.  This new evidence effectively eviscerates the Government's argument that cooperation agreements act in effect as guarantors of the truthfulness of cooperating witnesses.

## ARGUMENT

### Point One

### There Is Insufficient Evidence to Prove that the Racketeering Acts Charging the Shamrock Murders Were Related to the Enterprise.

**A.    Standard of Review and Overview of Relevant Law**

Viewing the record as a whole, we submit that there is insufficient evidence

to support the verdict. In particular, there is insufficient evidence to prove that the

Shamrock Murders were related to the Enterprise as is required to find a

racketeering act proven beyond a reasonable doubt.

The standard for assessing a challenge to the sufficiency of the evidence is

well established:

> A jury's verdict must be sustained if "*any* rational trier of fact could
> have found the essential elements of the crime beyond a reasonable
> doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 . . . (1979) (emphasis
> in original). We assess the evidence "in the light most favorable to
> the government, crediting all inferences in its favor," *United States v.*
> *Berger,* 224 F.3d 107, 116 (2d Cir. 2000) (citing *United States v.*
> *Moore,* 208 F.3d 411, 413 (2d Cir. 2000) (per curiam)), and "[a]ll
> issues of credibility, including the credibility of a cooperating witness,
> must be resolved in favor of the jury's verdict," *United States v. Riggi,*
> 541 F.3d 94, 108 (2d Cir. 2008) (citing *United States v. Glenn,* 312
> F.3d 58, 64 (2d Cir. 2002)).

*United States v. Brooker*, 526 Fed. App'x 82, 84 (2d Cir. 2013).

"Sufficiency of the evidence review involves assessment by the courts of

whether the evidence adduced at trial could support any rational determination of

guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67

(1984) (citing *Glaser v. United States*, 315 U.S. 60, 80 (1942); Fed. R. Crim. P.

29(a)). "Despite the deference owed jury determinations, courts may not credit

inferences within the realm of possibility when those inferences are unreasonable."

*United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006); *accord United States*

*v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("the jury's inferences must be

'reasonably based on evidence presented at trial,' not on speculation . . . .").

In a RICO prosecution the Government must prove beyond a reasonable

doubt that the racketeering acts are related to one another and to the enterprise:

> The Government is required to show, inter alia, "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. N.W. Bell Tel. Co.,* 492 U.S. 229, 239 . . . (1989) (emphasis omitted). To establish that the predicate acts are related, **the Government must show that the racketeering acts relate both to one another and—of significance here—to the enterprise**. *See* [*United States v.*] *Polanco,* 145 F.3d [536,] 541 [(2d Cir. 1998)]; *United States v. Minicone,* 960 F.2d 1099, 1106 (2d Cir. 1992); *accord United States v. Corrado,* 227 F.3d 543, 554 (6th Cir. 2000). **Relatedness between the racketeering acts and the enterprise can be proven by showing either that: (i) the offense related to the activities of the enterprise, or (ii) the defendant was able to commit the offense solely because of his position in the enterprise**. *Minicone,* 960 F.2d at 1106; *accord United States v. Miller,* 116 F.3d 641, 676 (2d Cir. 1997).

*United States v. Bruno*, 383 F.3d 65, 83-84 (2d Cir. 2004) (emphasis supplied).

"[T]he pattern requirement should be interpreted to prevent the application

of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts." *United*

*States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc). "The

requirement of "relatedness embodies two different concepts. The racketeering

acts must be related to each other ("horizontal" relatedness), and they must be

related to the enterprise ("vertical" relatedness)." *United States v. Long,* 917 F.2d

691, 697 (2d Cir. 1990).

44

"Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." *Indelicato*, 865 F.2d at 1383-84. "The requisite vertical nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was 'enabled to commit the predicate offenses *solely by virtue of his position in the enterprise . . .*' or that 'the predicate offenses are related to the activities of that enterprise.'" *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (quoting *United States v. Robilotto,* 828 F.2d 940, 947-48 (2d Cir. 1987) (emphasis in original) (some internal quotation marks omitted)).

"That relationship is satisfied if the offense was related to the enterprise's activities, whether or not it was in furtherance of those activities, or if the defendant was enabled to commit the offense solely by virtue of his position in the enterprise." *United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997) (quoting *United States v. Thai,* 29 F.3d 785, 815 (2d Cir. 1994)); *see also United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (holding that to prove that predicate act related to the enterprise government must establish that defendant able to commit offense solely by virtue of his position in the enterprise or that the offense is related to the activities of the enterprise); *United States v. Tomero*, 496 F. Supp. 2d 253, 256 (S.D.N.Y. 2007) (finding evidence that defendant was able to commit

predicate offense solely by virtue of his position in the enterprise admissible as proof of vertical relatedness).

'[I]t is plain that for establishment of a RICO violation there must also be some kind of relationship between the acts and the enterprise, for each of the substantive RICO subsections prohibits a specific type of interplay between a pattern of racketeering activity and the enterprise." *Indelicato*, 865 F.2d at 1384. "Thus, no RICO violation can be shown unless there is proof of the specified relationship between the racketeering acts and the RICO enterprise." *Indelicato*, 865 F.2d at 1384.

**B.    The Murders Were Not Related to the Enterprise.**

The evidence makes plain that the Shamrock Murders resulted from a personal dispute over a spilled drink and were wholly unrelated to the Enterprise. Thus, despite the appalling nature of the incident, the Murders do not meet the legal requirements to qualify as racketeering acts.

The decision in *Bruno* is instructive.  In *Bruno*, the Court determined that the participation of two defendants—Polito and Fortunato—in a murder and an attempted murder was not related to the charged enterprise. *Bruno*, 383 F.3d at 84-85.  With respect to Polito—who was identified as an associate of the enterprise— the Court concluded that "no rational juror could have found that Polito was able to

46

arrange the Shootings '*solely by virtue of his position*' in the Genovese family."
*Bruno*, 383 F.3d at 85 (citing *Minicone*, 960 F.2d at 1106) (emphasis supplied).

The Court noted that "none of the shooters was a made member of the
Genovese Family; nor were the Shootings themselves sanctioned by the family.
Indeed, the evidence suggests otherwise." *Id*. at 84-85. Furthermore—rather than
being related to the enterprise—the Court found that the evidence indicated that for
Polito the "the murder . . . and attempted murder . . . were simply personal
matters." *Id*. As regards Fortunato, the Court found the evidence "even weaker
than the evidence against Polito." *Bruno*, 383 F.3d at 85.

Among the factors that the Court considered were that (a) the shootings were
done in contravention of the rules of the enterprise; (b) following the shootings, the
participants "laid low"; and (c) members of the enterprise considered killing one of
the shooters for his involvement. *Id*. at 84-85. The circumstances in the instant
case are strikingly similar to those in *Bruno* in virtually every respect.

**First**, just as in *Bruno*, the Shamrock Murders "were simply personal . . . ."
*Bruno*, 383 F.3d at 85. Indeed, the evidence is clear that the Shamrock Murders
resulted from a personal dispute stemming from an argument over a spilled drink.
By all accounts, on April 11, 1981, Frank Riccardi became confrontational with
another patron at the Shamrock Bar who had spilled a drink on Riccardi's well-
dressed date. A. 63, 219-221, 288, 305-306. Thereafter, when efforts to appease

47

Riccardi proved fruitless he left the bar at the direction of D'Agnese, one of the owners. A. 306. *Cf. Indelicato*, 865 F.2d at 184-85 (finding sufficient evidence of relatedness where murders designed to obtain control of enterprise).

According to the Government's witnesses, not long after his departure, Riccardi returned with Vernace and Ronald Barlin, and he confronted D'Agnese. A. 289-290. Riccardi shot D'Agnese in the face and one of the other individuals shot Godkin who had attempted to come to D'Agnese's aid holding what appeared to be a gun. A. 222-225, 291-292.

The evidence is, therefore, clear that the Murders arose from a personal dispute and were not related to the activities of the Enterprise. *Compare Bruno*, 383 F.3d at 84-85 *with Minicone*, 960 F.2d at 1107 (holding that although murder had personal element because the victim had threatened to kill the defendant, the threat "stemmed from [the victim's] plan to take over" a portion of the enterprise's criminal business). Unlike in *Minicone*, there was no relationship between the dispute over the spilled drink and any Enterprise business interest.

In fact, there is no evidence that either of the owners of the Shamrock had any connection whatsoever with the Enterprise or any of its members or associates. Indeed, unlike in *Minicone*, no one suggested that Godkin or D'Agnese posed any threat to the business of the Enterprise. *Minicone*, 960 F.2d 1107. Moreover, by all accounts, neither Riccardi nor Vernace or Barlin frequented the Shamrock.

Indeed, none of the witnesses could recall having seen any of them at the Shamrock prior to the night of the Murders. A. 63, 71, 77, 255, 289-290.

In addition, there is no evidence that the specter of the Enterprise played any role in the ability of Riccardi and his accomplices to commit the Shamrock Murders. Indeed, not a single witness testified that there was any indication that these individuals were affiliated with the Enterprise.

Furthermore, there is no evidence that the Murders were financially beneficial to the Enterprise. *Cf. United States v. Guzman*, 7 Fed. App'x 45, 52 (2d Cir. 2001) (finding murder related to enterprise where murder was financially beneficial to the enterprise); *accord Indelicato*, 865 F.2d at 1383-84 (holding that evidence that act furthers interests of enterprise may be sufficient to prove relatedness).

**Second**, as in *Bruno*, none of the participants were official members of the Enterprise; the witnesses uniformly testified that in 1981, Riccardi, Barlin, and Vernace were associates of the Enterprise. A. 131-135, 171, 431. *Cf. Guzman*, 7 Fed. App'x at 52 (finding that defendant's leadership position enabled the commission of murder).

**Third**, the Murders were not sanctioned by the Enterprise but rather were committed in contravention of the rules of the Enterprise. *Bruno*, 383 F.3d at 85. Thus, despite the fact that Riccardi was an associate in Fat Andy's crew, Riccardi

49

did not follow the requisite protocol of putting on record in advance his intention to commit the Shamrock Murders with the soldier to whom he reported, i.e., Fat Andy. Fat Andy, therefore, was unable to bring the matter to the attention of his captain as required, and his captain in turn never sought approval of the Murders from the boss, who is the only person who can approve a murder. A. 204-205, 588-589, 595-596. Indeed, in contrast to the Shamrock Murders, Ruggiano set out in detail the steps taken to obtain approval prior to his murder of his brother-in-law. A. 208-209. Likewise, Ruggiano testified to the meeting that was held in order to obtain approval to murder Riccardi for the unsanctioned Shamrock Murders. A. 169-171, 211. The Murders were, thus, plainly unsanctioned and committed in violation of the rules.

**Fourth**, Riccardi's ability to recruit accomplices was not due "solely" to his position in the Enterprise but was instead based upon personal relationships. *Bruno*, 383 F.3d 85. As Ruggiano put it, "we had nothing to do with Ronnie the Jew and Bobby Glasses. They weren't with us." A. 171.

In fact, Riccardi was taken to task for recruiting Vernace and Barlin to assist him rather than members of his own crew. A. 162. Ruggiano testified that there was animosity between Fat Andy's crew and the crew with which Vernace was associated stemming from its formation by members of Fat Andy's crew who departed in a mass exodus. A. 131-135, 154-156, 171.

50

The persistence of the animosity is born out by the fact that Riccardi was immediately chastised for obtaining assistance from members of that crew instead of his own: "[W]hat do you mean you went there?  What should you go there for?  You know you're not supposed to go there."  A. 162.  Thus, in addition to his failure to get Fat Andy's approval, Riccardi also violated the rules by obtaining assistance from individuals who were not members of his crew.

Moreover, there is no evidence that Vernace agreed to accompany Riccardi out of a sense of loyalty or duty to a fellow associate of the Enterprise—and any such a conclusion is pure speculation and not a reasonable inference based upon identifiable evidence.  *Quattrone*, 441 F.3d at 169; *Torres*, 604 F.3d 58, 67.  In addition, such a suggestion is contrary to the evidence that criminal activity—and murder in particular—was required to be put on record in advance of commission. A. 126, 205, 595-596.

Riccardi, therefore, was not able to obtain assistance "solely" because of his position with the Enterprise; he was able to do so in spite of it.

**Fifth**—just as in *Bruno*—members of the Enterprise disapproved of the Murders and planned to kill Riccardi as a result.  *Bruno*, 383 F.3d at 85. According to Ruggiano, John Gotti was unhappy about the Shamrock Murders and said "that it was a horrendous thing that this guy killed two people for no reason."

51

A. 160.  Ruggiano testified further that Fat Andy readily agreed with Gotti's

proposal to kill Riccardi:

> A: Because at that point **[Fat Andy] was very unhappy with [Riccardi]**, and **he didn't like what he did**.  He didn't like the whole incident.  He said it was not a nice thing that he did, and he caused a lot of trouble for everybody.

> Q: When you say it "caused a lot of trouble," what did you understand that to mean?

> A: Well, **he caused a lot of trouble for innocent people** and for the Gottis.

A. 171 (emphasis supplied).  Ruggiano testified that Fat Andy was disgusted by the

Shamrock Murders and displeased that Riccardi had done "his normal routine of

getting drunk and starting trouble . . . ."  A. 203-204.  In other words, Fat Andy

deemed Riccardi's actions beyond the scope of the Enterprise.

**Sixth**, just as the defendants in *Bruno* "laid low," *Bruno,* 383 F.3d at 85,

following the Murders, Riccardi—after a failed attempt on his life—was never

seen again and, according to the Government's witnesses, Vernace—likely aware

of the plan to kill Riccardi—went into hiding for years.  A. 174-176, 453-457.

Thus, the Murders were unrelated to the Enterprise for reasons starkly

similar to those in *Bruno*: (a) the Murders were a personal matter; (b) none of the

participants was an inducted member of the Enterprise; (c) the Murders were not

sanctioned and were done in contravention of the rules of the Enterprise; (d)

Riccardi's ability to obtain assistance was based upon personal relationships, not

his association with the Enterprise; (e) members of the Enterprise considered killing Riccardi for his involvement; and (f) following the Murders, the participants "laid low" – indeed, Vernace apparently disappeared for several years and Riccardi was never seen again. *Bruno*, 383 F.3d at 84-85.

Furthermore, though the cooperators uniformly claimed that acts of violence are valued in organized crime and lead to increased respect, A. 444, 489-496, 567, the evidence is clear that the Enterprise does not support the use of indiscriminate violence to resolve personal matters because such actions bring unwanted attention to the Enterprise and demonstrate that a person is volatile and unreliable.

This principle is embodied in the disgust and displeasure shared by John Gotti and Fat Andy in response to the Shamrock Murders. Gotti thought "that it was a horrendous thing that this guy killed two people for no reason," A. 211, and Fat Andy was displeased that Riccardi had "done his normal routine of getting drunk and causing trouble." A. 203-204.

Thus, in accordance with the principle against the use of violence to resolve personal disputes, Ruggiano testified that upon induction, members were instructed that if they had any personal vendettas they "had to let them go." A. 151. Moreover the testimony of other cooperators corroborates Ruggiano in this regard.

For example, when a personal dispute led Santos to stab an individual in an act of vengeance outside an establishment controlled by the Enterprise, he was

chastised and punched in the mouth so hard that he lost a tooth. A. 518. Thus, though Santos claims that his acts of violence garnered respect, his indiscriminate act of personal vengeance instead resulted in a demeaning beating.

Similarly, when Fiordilino sought permission to kill Thomas Sajn for personal reasons, his Enterprise superior denied permission and criticized him for seeking to use violence to resolve a personal dispute. A. 647, 672-673. Thereafter, when Fiordilino nevertheless killed Sajn, he, too, was "rewarded" with a punch in the mouth, a refusal to help him obtain a union position, and reassignment to a different crew. A. 653-654, 677-678.

Moreover, as regards the impact of the Murders on Vernace, no rational juror could reasonably infer that Vernace's participation in the Shamrock Murders benefitted him. First, not one witness testified that the Murders impacted Vernace's reputation, much less increased the respect that he received. In fact, not one of the Government's witnesses testified that Vernace was known for violence or that his value to the Enterprise was based upon his ability to commit acts of violence. To the contrary, Fiordilino testified that violence is "just not [Vernace's] way." A. 658-659.

Second, as noted, following the Murders, Vernace went into hiding for a number of years (perhaps due in part to his knowledge that Riccardi had been marked for death). A. 174-176, 453-454. Thus, the Enterprise plainly did not

celebrate the knowledge that Vernace participated in shooting two civilian bar owners in front of a room full of patrons to resolve a personal dispute over a spilled drink.

Third, the Murders occurred in 1981. According to the evidence, Vernace was inducted into the Enterprise in 1999—some 18 years later—hardly the fast track to induction that Ruggiano claimed murder provided. A. 151. Had Vernace been inducted soon thereafter, a reasonable argument could be made that the knowledge that he was "capable" led to his induction. As it stands, for Vernace, murder did not prove to be the reliable means of induction that Fiordilino described. A. 633-634.

Thus, even when viewed in the light most favorable to the Government, there is no evidence from which one could reasonably infer that Vernace's participation in the Shamrock Murders led to his induction 18 years later. Indeed, the cooperators testified that there was a near immediate increase in the respect that they were accorded following their own acts of violence. A. 487-488, 567, 656.

Thus, one could not reasonably infer that Vernace's participation in a crime that was otherwise roundly reviled resulted in a *post hoc* reward 18 years subsequent to its commission. Moreover, though Ruggiano, Fiordilino, and Gambina all testified that their acts of violence had a beneficial impact on their organized crime careers, despite their considerable propensity for violence, not one

was inducted as an official member (Santos is ineligible for membership because he is not Italian).

In addition, though there was testimony that, following the Murders, Ronald "Ronnie One Arm" Trucchio—an alleged associate of the Enterprise at the time of Murders—attempted to speak to the bartender, Patrick Sullivan, and had a brief conversation with Jean Wells, a Shamrock patron, there was no testimony that either was aware that Trucchio was associated with the Enterprise.

Indeed, both identified Trucchio simply as a guy from the neighborhood and failed to confirm any knowledge that he was affiliated with the Enterprise. A. 233-234, 298-299. Furthermore, both testified that neither Trucchio nor anyone else ever threatened them in any manner whatsoever. A. 242, 269, 301-303.

In addition, when Trucchio spoke to Wells, though she openly admitted that she had met with a prosecutor, Trucchio did not ask what was discussed or indicate that she should not speak with law enforcement. Rather, Trucchio simply asked how Wells was doing to which she responded "okay," following which Trucchio said "good girl," and departed never to be seen by Wells again. A. 301, 303. Accordingly, Trucchio's inconsequential actions do not make the otherwise indiscriminate act of violence related to the Enterprise.

Thus, despite the Government's attempt to tie the Enterprise to the crime through various insinuations, according to the witnesses, it was simply a violent

outburst in response to an everyday occurrence at a bar.  As Sullivan put it in describing his fear following the Murders, "[i]t just seemed like two men were dead over a spilled drink.  I think that was reason enough to be afraid."  A. 239.

Accordingly, because the Shamrock Murders were neither related to the activities of the Enterprise nor made possible "solely" as the result of anyone's position in the Enterprise, the evidence is insufficient to support the jury's verdict with respect to Racketeering Acts Two and Three.

### Point Two

### There Is Insufficient Evidence to Prove that (a) Vernace Was Involved in the Heroin Charges, or (b) the Heroin Charges Were Related to the Enterprise.

The law set forth in Point One *supra* is applicable to the challenge to the sufficiency of the evidence raised here; accordingly, it is restated only as required to support the argument.

As set forth in detail below, there is essentially *no* evidence that Vernace had any involvement in the Heroin Charges.  Moreover, the Heroin Charges were neither related to the activities of the Enterprise nor accomplished "solely by virtue of [Vernace's] position in the enterprise."  *Miller*, 116 F.3d at 676.  Indeed, the evidence regarding the Heroin Charges is even weaker than that regarding the Murders in terms of any relationship to the Enterprise.

As set forth in detail in the Statement of the Case, the Heroin Charges stem from a 1981 DEA investigation of Bruce Erbacher and Herbert Frank.  The

57

investigation culminated in the May 13, 1981 arrest of Herbert and Pauline Frank, George Glecker, Milagros Gludau, Ronald Barlin, and Anthony Cuccio, which occurred in the Franks' apartment.  A. 683.  Erbacher had previously been arrested and cooperated.  All were indicted and tried in a New York State prosecution.

According to DEA agent Diaz, on the day of the arrests, a person who identified himself as "Pepe" called the Franks' apartment and spoke briefly with Pauline Frank and Cuccio while agent Diaz listened—neither heroin nor anything else illegal was mentioned in the conversation.  A. 327.  In addition, Diaz testified that Erbacher had previously identified his suppliers as "Ron and Pepe."  A. 321.  Based upon that information, the indictment included an unknown individual identified as "John Doe, a/k/a Pepe."  A. 330.  Notably, however, during his investigation, Diaz never filed any report or made any note that his investigation revealed the involvement of anyone named "Pepe."  A. 346-348, 350, 353-354, 358-362.

## A. There Is Insufficient Evidence to Prove Vernace's Involvement in the Heroin Charges.

There is no credible evidence that Vernace was involved in the Heroin Charges.  The Government must adduce evidence sufficient to demonstrate that Vernace knew the nature and specific object of the charged conspiracy.  *United States v. Lorenzo*, 534 F.3d 153, 160-61 (2d Cir. 2008) (finding evidence insufficient to prove "any indication from which a jury could reasonably infer that

[defendant] knew of the nature and specific object of the [cocaine] conspiracy."); *United States v. Torres*, 604 F.3d 58, 70 (2d Cir. 2010) (same).  Here, no such evidence exists.

The sole evidence purportedly connecting Vernace to the Heroin Charges came from Milagros Gludau—an illegal alien with a history of drug abuse, prostitution, bribery, and falsification of official documents—who testified to avoid deportation and a 20-year prison sentence.  A. 368-371, 400.  As noted, Gludau was arrested as part of the 1981 DEA investigation and served a six-month prison sentence as the result of her conviction.  A. 368.

Gludau testified that, one evening in 1981, she was in Herbert Frank's apartment for dinner with her drug dealing boyfriend, George Glecker.  A. 380-381.  According to Gludau, at some point during the evening, two men entered the apartment and went into the bedroom with Herbert Frank.  A. 380-381.  The bedroom door was closed while they were in the room.  A. 381-382.  When they left the room, Gludau testified that it took about "a second" for the two men to exit the apartment.  A. 410.

Nonetheless, when shown a 1993 photograph of Vernace, Gludau claimed that she recognized the individual as one of the two men she saw exiting the apartment 32 years earlier in 1981.  A. 389.  As noted, the photograph was taken in 1993—some 12 years after the evening in Herbert Frank's apartment when Gludau

saw a man for "a second" as he exited the apartment.  A. 410.  Moreover, it was not until 2013, some 32 years after the evening in Herbert Frank's apartment, that Gludau first saw the 1993 photograph of Vernace.  A. 389.  Furthermore, Gludau testified that the only time that she had ever seen the man in question was on the evening in Herbert Frank's apartment.  A. 410.  Under these circumstances, Gludau's identification of Vernace is dubious at best.

Her identification of Vernace is further suspect in light of the fact that Gludau could not identify photographs of Ronald Barlin or Anthony Cuccio, both of whom were present in the apartment at the time of her arrest and were co-defendants at her two-week trial, which also included numerous pretrial court appearances and four days of pretrial hearings.  A. 390-391, 405, 683-684.

Gludau's inability to identify Cuccio is particularly astonishing given the fact that his head was bandaged as the result of a gunshot wound, which gave him a distinct and presumably memorable appearance.  A. 405.  Moreover, Gludau had no recollection of either Barlin or Cuccio being present in the apartment at the time of her arrest, or being present at trial or during any of their many other court appearances—indeed, she could not even recall that a person named Ron was involved in, or even mentioned at, her trial.  A. 406-409, 412-413.

Gludau also did not recall that Hebert Frank's wife's name was Pauline or that Pauline Frank testified during the pretrial hearings.  A. 409.  Nevertheless, 32

60

years after the fact, Gludau claims to recognize Vernace as the man she supposedly saw for "a second" as he exited Herbert Frank's apartment. Moreover, the photograph depicts Vernace not as he would have appeared in 1981 but 12 years later in 1993.

Under the circumstances, we submit that even viewing Gludau's testimony in the light most favorable to the Government, one is hard pressed to find that a rational juror could conclude beyond a reasonable doubt that Vernace was involved in heroin distribution with Herbert Frank and company based on Gludau's testimony, which is the lone source of evidence connecting him to the Heroin Charges.

Furthermore, Annette Frank testified that she was familiar with Barlin, Cuccio, Erbacher, and Gludau—some of whom she described as friends of her father who were regularly present in her parents' apartment. A. 419-425. By contrast, though she recognized a photograph of Vernace, she had no recollection of having seen him at her parents' apartment and acknowledged that she may have recognized him from internet research she conducted after being subpoenaed to testify at trial. A. 426-428.

In addition to the unreliability of Gludau's testimony, it is also noteworthy that the day of the arrests was May 13, 1981—one month after the April 11, 1981 Shamrock Murders following which Vernace was supposedly in hiding. A. 174-

176, 453-454.  The timing is significant for two reasons: First, Gludau testified that the evening on which she was in Herbert Frank's apartment for dinner was not long before her arrest, which makes it highly unlikely that Vernace was in the apartment on the night in question.  A. 380.  Second, given that Vernace was in hiding at the time of the arrests, it is similarly unlikely that he was the "Pepe" who called Herbert Frank's apartment and spoke with Agent Diaz on the day of the arrests.

Thus, even when viewed in the light most favorable to the Government, the evidence is insufficient to prove that Vernace knew the nature and specific object of the charged conspiracy.  *Lorenzo*, 534 F.3d at 160-61.  Indeed, there is no evidence that Vernace was involved in any heroin transactions; Erbacher was unable to obtain the large quantity of heroin that Agent Diaz requested; and Agent Diaz made no efforts to arrange a meeting with the alleged suppliers "Ron and Pepe."  A. 345-349.

Accordingly, under the circumstances, we submit that the evidence is insufficient to support the jury's finding with respect to Racketeering Act One.

**B.**     **The Heroin Charges Were Not Related to the Enterprise**.

Even were one to credit Gludau, however, Vernace's involvement still fails to prove that the Heroin Charges were related to the Enterprise.  Indeed, there is no evidence in the record that the Enterprise provided any assistance in obtaining or

62

distributing heroin; that the Enterprise profited; or that the Enterprise was even aware of the charged conduct.

The sole source of evidence regarding the connection between the Enterprise and the Heroin Charges is Agent Diaz, an undercover DEA agent with a checkered past and a history of violating DEA protocol. For example, Diaz had no reluctance about revealing the identity of an informant to a gun-dealing friend, who later told Diaz "[t]hat snitch, he ain't doing no snitching no more." A. 338-340.

On another occasion—against DEA policy—Diaz allowed a confidential informant to carry a firearm. A. 333-334. In yet another instance, Diaz, while armed, threatened a doctor with bodily harm when Diaz was dissatisfied with medical care being provided to Diaz's brother. A. 334-336.

In keeping with his loose adherence to DEA protocol, Agent Diaz inexplicably destroyed his notes from his investigation of the Heroin Charges even before the trial of Herbert Frank, *et al.* A. 341-342. It is against this backdrop that one must view Diaz's testimony, which is the only evidence that can be claimed to connect the Enterprise to the Heroin Charges.

Diaz testified that Bruce Erbacher—a junkie drug dealer who subsequently became a cooperating witness—told Diaz that his suppliers "Ron and Pepe" were "well organized," which Diaz understood to mean "Italian Mafia, organized crime . . . ." A. 316. Diaz explained that he drew his conclusion from the word

63

"organized" because "that was really the main label that was affiliated with Italian Mafia families, organized crime." A. 316.

In addition, Diaz testified that Herbert Frank—a drug dealer to whom Erbacher introduced Diaz—ironically used the same description of his suppliers, i.e., "well organized." A. 318. According to Diaz, he responded to Herbert Frank by saying, "connected. Family" to which Herbert Frank reportedly replied, "you got it," which Diaz understood to mean "Italian Mafia." A. 318-319.

Though the connection is attenuated, viewing the evidence in the light most favorable to the Government, one can reasonably conclude that Herbert Frank and Erbacher believed that their suppliers were associated with organized crime. Diaz's testimony, however, does not support the conclusion that the heroin distribution in which Erbacher and Herbert Frank were involved was related to the activities of the Enterprise or that it was made possible "solely by virtue of [Vernace's] position in the [E]nterprise." *Miller*, 116 F.3d at 676.

Moreover, there is considerable evidence that various members of the Enterprise engaged in crimes that they did not consider to be related to the Enterprise, and that such crimes—and especially drug dealing—were frequently conducted secretively.

Ruggiano, for example, testified that he sold between 10,000 and 15,000 barbiturates but that the Enterprise was unaware of this activity because he

64

specifically decided not to put his drug dealing on record with the Enterprise because selling drugs is against the rules.  A. 198.  Ruggiano also conducted an off-record marijuana and cocaine distribution business that was concealed from the Enterprise.  A. 202.  In fact, according to Ruggiano, his drug dealing was not part of the Enterprise because it violated the rules.  A. 198-199.

Similarly, Fiordilino testified that when he murdered Sajn and stole several kilograms of cocaine from him, he confessed his involvement in the murder to his organized crime superior but did not disclose the stolen drugs because he feared "strong repercussions."  A. 674-676.

Santos also testified to crimes that he committed that were not disclosed to the Enterprise and were not part of the Enterprise, including arson, home invasions, and burglaries.  A. 449-450, 497-498, 519.  As regards drug dealing—a crime in which Santos engaged—he acknowledged that it was prohibited but paraphrased the rule as "basically don't get caught," which amounts to a warning to proceed at one's own risk.  A. 446.  In sum, Santos acknowledged that he committed numerous crimes for his own purposes that had nothing at all to do with the Enterprise.  A. 520.

Gambina similarly testified that he, too, committed crimes for his own benefit that he did not report to his superiors—"these were crimes that [he] committed for [his] own personal reasons."  A. 590.  Thus, despite the rule against

drug dealing—which Gambina testified is punishable by death—Gambina sold cocaine and heroin without reporting it to anyone in the enterprise with which he was affiliated and kept all of the money for himself.  A. 537-539, 540-542, 592-593.

Consequently, the mere fact that numerous individuals involved in organized crime engaged in drug dealing does not satisfy the legal requirement that the heroin distribution charged here was related to the activities of the Enterprise or that it was "solely by virtue of [Vernace's] position in the [E]nterprise" that he was able to engage in the charged conduct.  *Miller*, 116 F.3d at 676.  Indeed, even viewing the evidence in the light most favorable to the Government, it is far more likely that if Vernace was involved at all, it was conduct that was concealed from the Enterprise—particularly given that he was in hiding at the time.

The reality is that there is simply no evidence to support a claim of relatedness—any connection to the Enterprise is pure speculation, which is not permitted even under the liberal standard for a challenge to the sufficiency of the evidence.  *Quattrone*, 441 F.3d 153, 169.  The evidence all points to the fact that the Enterprise prohibits drug dealing but that some individuals nonetheless secretively engage in it for their own personal gain.

Accordingly, in light of the fact that there is no evidence from which a rational juror could conclude beyond a reasonable doubt that the Heroin Charges

were related to the activities of the Enterprise or that they were made possible solely by virtue of Vernace's position in the Enterprise, we submit that the evidence is insufficient to support the jury's verdict with respect to Racketeering Act One.

## Point Three

### The Evidence Is Insufficient to Support The Firearms Conviction on Count Two.

There is insufficient evidence to support the firearms violation charged in Count Two. This conclusion flows from the fact that (a) there is insufficient evidence to support the Shamrock Murders, (b) there is insufficient evidence to support the Heroin Charges, and (c) there is a lack of any other evidence to support a violation of 18 U.S.C. § 924(c). Accordingly, the conviction on Count Two should be reversed. The standard for a challenge to the sufficiency of the evidence is set forth in Point One, *supra*.

"A federal criminal statute, § 924(c) of Title 18, prohibits 'us[ing] or carr[ying]' a firearm 'during and in relation to any crime of violence or drug trafficking crime.'" *Rosemond v. United States*, 134 S. Ct. 1240, 1243 (2014). Absent proof of a defendant's own use or carrying of a firearm in connection with a qualifying crime, "the Government makes its case by proving that the defendant actively participated in the underlying drug trafficking or violent crime with

67

advance knowledge that a confederate would use or carry a gun during the crime's commission." *Rosemond*, 134 S. Ct. at 1243.

"Section 924(c) provides that 'any person who, during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm,' shall receive a five-year mandatory-minimum sentence, with seven- and ten-year minimums applicable, respectively, if the firearm is also brandished or discharged." *Rosemond*, 134 S. Ct. at 1243 (quoting 18 U.S.C. § 924(c)(1)(A)) (modifications in quoted material)).

"To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Rosemond*, 134 S. Ct. at 1248 (quoting *Nye & Nissen v. United States,* 336 U.S. 613, 619 (1949)). "So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Rosemond*, 134 S. Ct. at 1249.

> An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one. In so doing, he has chosen . . . to align himself with the illegal scheme in its entirety—including its use of a firearm. And he has determined . . . to do what he can to "make [that scheme] succeed." *Nye & Nissen,* 336 U.S. at 619, 69 S. Ct. 766. He thus becomes responsible, in the typical way of aiders and abettors, for the

68

conduct of others. He may not have brought the gun to the drug deal himself, but because he took part in that deal knowing a confederate would do so, he intended the commission of a § 924(c) offense—*i.e.,* an armed drug sale.

For all that to be true, though, the § 924(c) defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice. When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun.

*Rosemond*, 134 S. Ct. at 1249 (brackets and italics in quoted material).

Here, the district court sentenced Vernace based upon the use of a gun in connection with the Shamrock Murders. Though not explicitly stated, it is evident that the district court relied on the Shamrock Murders because it imposed a ten-year sentence, which is applicable only when a firearm is discharged, and there is no evidence that a firearm was discharged in connection with any other charge in the case. A. 741-742.[3] Thus, because—as demonstrated above—there is

---

[3] In 1981 when the Shamrock Murders occurred, § 924(c) had a one-year mandatory minimum, a ten-year maximum, and did not require consecutive sentencing. *Bailey v. United States*, 516 U.S. 137, 147 (1995) (superseded by statute). Accordingly, at a minimum, resentencing is required to rectify this error.

69

insufficient evidence to support the jury's finding with respect to the Shamrock

Murders, the conviction on Count Two cannot be based upon the Murders.[4]

Because there is also insufficient evidence to support the jury's finding with

respect to the Heroin Charges, Count Two similarly cannot be based upon that

conduct. Even if the Court were to find the Heroin Charges sufficiently proved,

they nonetheless provide an inadequate basis to support the § 924(c) charge.

The only evidence of firearms in the context of the Heroin Charges came

from Gludau and Annette Frank. Gludau testified that on an evening in 1981, she

witnessed two men enter Herbert Frank's apartment, go into the bedroom and close

the door. A. 380-381. According to Gludau, when the men exited the bedroom,

she saw approximately three guns on the bed. A. 381. Annette Frank testified

simply that she saw firearms in her parents' apartment. A. 419. There is no other

evidence of firearms in the context of the Heroin Charges.

There is, however, no evidence that the firearms that Gludau or Annette

Frank saw had any actual connection with the Heroin Charges. First, with respect

to the firearms that Gludau saw, there is no evidence that they were not in the

bedroom prior to the arrival of the two men, and, therefore no evidence that the

---

[4] In addition, § 924(c) requires that the "crime of violence" upon which a violation
is based is one that "can be prosecuted in a court of the United States." 18 U.S.C.
§ 924(c). Thus, because the Murders are not related to the Enterprise, they do not
qualify as "crime[s] of violence" that can "be prosecuted in a court of the United
States" and cannot support the § 924(c) charge. A. 50-51.

two men brought the guns into the apartment.  Second, with respect to the firearms that both Gludau and Annette Frank saw, there is no evidence that the firearms were ever used or carried in connection with the Heroin Charges, which in 1981 was required.  *Bailey v. United States*, 516 U.S. 137, 143 (1995) (superseded by statute).

Indeed, prior to the 1998 amendment of § 924(c), which added possession as a basis for conviction, the Supreme Court had held that "use" required more than mere possession.  *Bailey*, 516 U.S. at 143.  Under *Bailey* the Government was required to prove that "the defendant actively employed the firearm during and in relation to the predicate crime."  *Bailey*, 516 U.S. at 150.  Plainly, the Government did not sustain that burden here with respect to the Heroin Charges.

There is similarly no evidence to sustain the § 924(c) conviction in connection with any other offense charged in the Indictment.  Indeed, though the cooperators all discussed various acts of violence in which they engaged, the vast majority of those crimes had no connection to Vernace at all.  Moreover, as to those crimes with which the Government presented evidence that Vernace was involved, there is no evidence that Vernace had foreknowledge that such crimes would involve the use or carrying of a firearm.  *Rosemond*, 134 S. Ct. at 1249.  Thus, for example, though Santos testified to a robbery he committed based upon a tip from someone with whom Vernace directed him to speak, Santos did not

71

indicate that Vernace had any knowledge whatsoever that the actual participants used firearms.  A. 499-511.

Consequently, regardless of any evidence that another individual used or carried a firearm in connection with a crime, such evidence is insufficient in the absence of proof that Vernace had advance knowledge that a firearm would was to be involved—and none was presented.  Accordingly, Count Two should be reversed because there is insufficient evidence to support it.

**Point Four**

**The Prejudicial Spillover from the Evidence Admitted
In Support of the Murder Charges, the Heroin Charges, and the
<u>Firearms Charge Requires a New Trial on the Remaining Charges</u>**.

In light of the fact that there is insufficient evidence to support the Shamrock Murders, the Heroin Charges, and the firearms Count, a new trial is required on the remaining charges due to the inflammatory nature of the evidence admitted in support of those charges:

> "We look to the totality of the circumstances to assess prejudicial spillover of evidence."  *United States v. Naiman,* 211 F.3d 40, 50 (2d Cir. 2000).  "Specifically we examine: 1) whether the evidence on the [reversed] counts was inflammatory and tended to incite or arouse the jury to convict the defendant[s] on the remaining counts; 2) whether the evidence on the [reversed] counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the [G]overnment's case on the remaining counts."  *Id.*

*Bruno*, 383 F.3d at 91 (vacating conviction on false statement count in light of prejudicial spillover from reversal on charges relating to murder and attempted murder) (modifications in quoted material).

In the instant matter, there can be no doubt that the evidence admitted in support of the brutal killing of two young men over a dispute involving a spilled drink in a bar, heroin trafficking, and firearms was inflammatory. By contrast, the remaining charges involved gambling, loansharking, and a single robbery in which Vernace did not participate directly.

As demonstrated below, the evidence regarding the murder, heroin, and firearms charges was highly inflammatory and undoubtedly incited the jury to convict Vernace on the remaining charges. Moreover, there can be no dispute that the evidence admitted in connection with the remaining charges was of a distinctly different nature.

With respect to the Murders, there was extensive testimony regarding the gunshot wounds that each man suffered, the blood that resulted from those wounds, and the trauma that the individuals who witnessed the Murders experienced—indeed, witnesses testified to attempting to stop the blood that was shooting out of D'Agnese's face. A. 67, 229. The Murders were also the basis upon which the Government elicited testimony from its cooperating witnesses

about the various acts of violence in which they engaged, arguing that such violence was designed to increase respect.

Thus, Ruggiano testified about having murdered his sister's husband; Fiordilino described shooting Sajn in the back of the head for no reason other than to keep up with his fellow organized crime associates; Gambina described beating an individual with a hammer; and Santos described shootings and stabbings that he had done. A. 208-209, 449, 543-555, 643-644. The record is clear that the Government elicited all of this testimony to combat Vernace's defense that the Shamrock Murders were the result of a personal dispute and were unrelated to the Enterprise.

Therefore, if the trial did not include the Shamrock Murders, the jury would not have been exposed to the graphic testimony directly related to those charges or to the equally disturbing testimony that the cooperators offered regarding their own acts of gratuitous violence. It is impossible to deny that such evidence is inflammatory and likely tended to cause the jury to convict on the other charges.

Similarly, the evidence admitted in support of the Heroin Charges is also inflammatory. In light of the decades long war on drugs in this country, it is beyond dispute that narcotics trafficking is a potent issue that is likely to inflame the hearts of many. Here, a DEA agent testified that he uncovered a heroin distribution network that involved multiple participants. A. 310.

74

The evidence also included the testimony of Annette Frank, who at the time of the charged conduct was a 12-year-old girl living in her parents' apartment where she witnessed first-hand their drug dealing operation, which ultimately resulted in the imprisonment of both her mother and father, who are since deceased. A. 416-419.

Annette Frank testified that at age 12 she witnessed the comings and goings of various unsavory characters, such as Erbacher, whom she described as a strung out alcoholic, and Gludau whom she described in similar terms. A. 423, 425. The testimony of a woman recounting her childhood amidst her parents' drug trafficking, their imprisonment, and ultimately their death is nothing short of inflammatory—particularly given that she did not even identify Vernace as involved in her parents' criminal activity—and undoubtedly prejudicially impacted the jury with respect to the remainder of the case.

Gludau's testimony regarding her own slide into prostitution, her infidelity with her drug dealing boyfriend, George Glecker, and her involvement in numerous drug-related meetings is similarly inflammatory. Gludau's tale of her illegal conduct, including prostitution, drug trafficking, bribery, and fraud most certainly had a prejudicial impact on the jury.

Similarly, evidence regarding firearms is far more inflammatory than the remaining charges, which primarily related to gambling and to a lesser extent,

loansharking and a single robbery.  Thus, all told, the evidence admitted in

connection with the Shamrock Murders, the Heroin Charges, and the firearms is

inflammatory and likely incited the jury to convict on the remaining charges.

Moreover, as noted above, the evidence admitted in support of the Murders,

the Heroin Charges, and firearms is not similar to the evidence admitted to prove

the gambling, loansharking, and robbery charges.  Indeed, witness accounts of

"Joker Poker" machines played in the backrooms of social clubs and loans made to

players at the yearly baccarat games are utterly distinct from the testimony

regarding the Murders and the Heroin Charges.  A. 458-486, 512-517, 568-585.

Furthermore, even the limited evidence of loansharking that was unrelated to

the baccarat games is tame in comparison to the evidence regarding the far more

serious murder and drug charges.  *See, e.g.*, A. 143-146, 441, 451-452, 464, 467-

475.  With respect to the Robbery Charge, the testimony regarding Vernace's

involvement was simply that he told Santos to speak to another individual, who

told Santos that he had information about a house from which Santos could steal a

considerable amount money.  A. 499-511.  From that point forward, Vernace was

entirely uninvolved in the robbery.

In light of the highly prejudicial nature of the evidence regarding the

Shamrock Murders, the Heroin Charges, and firearms, combined with the fact that

it is entirely different in nature from the evidence admitted in support of the

remaining charges, its impact on the jury cannot be ignored. In addition, the

volume of evidence offered regarding the more serious charges substantially

outweighed the testimony that the Government offered relating to the remaining

charges. Thus, there is a substantial probability that having been told that Vernace

was a drug dealer and a murderer, the jury was unable to weigh the limited

remaining evidence fairly.

Put another way, the evidence regarding the Murders, the Heroin Charges,

and the firearms, combined with the testimony of Ruggiano, Gambina, Santos, and

Fiordilino that violence is the currency of organized crime, made it nearly

impossible for the jury to consider fairly the limited testimony from those same

witnesses regarding gambling and loansharking.

Accordingly, we respectfully submit that the Court should order a new trial

on the remaining charges.

## Point Five

**A New Trial Is Required Based Upon Newly Discovered Evidence
That A Crucial Cooperating Witness Was in Violation of a Material
Term of His Cooperation Agreement Prior to, During, and Following
Trial in that He Was Engaged in an Ongoing Pattern of Criminal Activity.**

The district court erred in denying Vernace's motion for a new trial based

upon the newly discovered evidence that cooperating witness Francesco Fiordilino

was in violation of his cooperation agreement at the time of his testimony in that he

was engaged in a pattern of criminal activity during the period of his cooperation—

including the period of Vernace's trial:

> A new trial pursuant to Rule 33 based on newly discovered evidence may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir. 1980); *see also United States v. Canova,* 412 F.3d 331, 349 (2d Cir. 2005); *United States v. Zagari,* 111 F.3d 307, 322 (2d Cir. 1997).

*United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007). This Court reviews a

district court's denial of a motion for a new trial pursuant to Federal Rule of

Criminal Procedure 33 for abuse of discretion. *United States v. Rivas*, 377 F.3d

195, 199 (2d Cir. 2004).

According to the Government, Fiordilino violated his cooperation agreement

as follows:

> Fiordilino disclosed that he had been engaging in illegal gambling activities and collecting illegal gambling debts on behalf of others to whom he (Fiordilino) himself owed gambling debts. Fiordilino made the disclosure because he feared for his safety because of his inability to satisfy his debts. In a subsequent interview with the Federal Bureau of Investigation, Fiordilino disclosed that he had been engaged in illegal gambling activities since approximately 2010.

A. 745.

The fact that Fiordilino was in violation of his cooperation agreement at the

time of his trial testimony due to his four-year pattern of criminal conduct plainly

constitutes newly discovered "evidence that could not with due diligence have been discovered before or during the trial . . . ."  *Owen*, 500 F.3d at 87.

Given that the Government did not disclose Fiordilino's ongoing pattern of criminal conduct until February 14, 2014, combined with its representation that it was not aware that Fiordilino was engaged in a pattern of criminal conduct until November 2013, there can be no dispute.  A. 745.

The fact that Fiordilino engaged in a pattern of criminal conduct during the period of his cooperation—and, in particular, throughout the period in which he testified in Vernace's trial—is also plainly material and not cumulative.  To be sure, Fiordilino never informed the jury that he remained an active criminal right up until the day of his testimony and that he intended to continue his criminal conduct following his testimony.

It is true that prior to trial the Government disclosed substantial information about Fiordilino's *historical* criminal conduct.  Such disclosure is entirely dissimilar to its post-trial disclosure.  The "new evidence" is not simply that Fiordilino engaged in additional criminal conduct beyond that which was disclosed to the jury.  The new evidence is that the jury was denied the knowledge that Fiordilino was—at the time of his testimony—in breach of a material term of his cooperation agreement.

79

Consequently, the jury would undoubtedly have been interested to learn that not only is the threat of prosecution for violating a cooperation agreement insufficient to ensure adherence to its terms, but that the Government does not even monitor villainous murders such as Fiordilino sufficiently to know when one of its cooperators is engaged in a four-year crime spree. Indeed, unbeknownst to the Government—and, therefore, the jury—Fiordilino was involved in ongoing criminal conduct as he sat upon the witness stand and testified against Vernace.

Thus, it is impossible to imagine that knowledge that Fiordilino was continuing to commit crimes even as he sat upon the witness stand would not have impacted the jury and most probably led to an acquittal had it been known at trial. *Owen*, 500 F.3d at 87. This issue has been phrased alternatively as follows:

> Another way to phrase the inquiry is "whether or not there is in reality a 'significant chance' that the disclosure would have induced reasonable doubt in the minds of enough jurors to prevent a conviction." *United States v. Rosner,* 516 F.2d 269, 273 (2d Cir. 1975).

*United States v. Wolfson*, S1 00-CR-628 (JGK), 2008 WL 1969730, *1 (S.D.N.Y. May 5, 2008).

The district court, however, erroneously found that Fiordilino's disclosure that he had engaged in illegal gambling and lied about it under oath amounts to mere impeachment evidence that does not warrant a new trial. A. 729-730. The district court's characterization of the evidence, however, misses the point.

80

The Government's case rested substantially on the testimony of its five cooperating witnesses—each of whom signed a cooperation agreement that in all material respects is identical. In particular, every cooperation agreement specifies that it is contingent upon the witness's agreement to refrain from further criminal conduct. Moreover, in its rebuttal summation—the Government's final opportunity to address the jury—the Government stressed the importance of the cooperation agreements. *See, e.g.,* A. 688 ("All these cooperation agreements are in evidence. Look at them if you want to understand how this works.").

The new evidence proves, however, that cooperation agreements do not guarantee a cooperator's truthfulness. Moreover, the Government did not even uncover Fiordilino's violation; he disclosed it to the Government when he needed protection. A. 745. The cooperation agreement, therefore, was not a sword hanging over Fiordilino's head but rather a shield that he used to his benefit. Indeed, there is no indication that the Government is seeking to enforce the terms of the agreement and have him sentenced to life imprisonment for the murder he committed, as it had its cooperators repeatedly tell the jury would happen if they violated their agreements. *See, e.g.*, A. 197, 396.

Thus, given that the foundation of the Government's case is composed of the testimony of cooperating witnesses, the revelation that the bedrock of that foundation—the cooperation agreements that each of those witnesses signed—is

fractured certainly "would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction." *Wolfson*, 2008 WL 1969730, *1 (internal quotation marks omitted).

Furthermore, Fiordilino offered critical testimony in support of the Government's case that went to the heart of Vernace's defense as regards critical charges in the case. A core aspect of Vernace's defense was that there was no evidence that the Shamrock Murders and the Heroin Charges were related to the Enterprise or to any other racketeering act charged in the indictment.

Thus, the Government offered Fiordilino's testimony that he had murdered someone and committed assaults to prove that he was "capable" and gain respect. A. 641, 643-647. The Government elicited from Fiordilino that being "capable" "means to be able, capable . . . if you have to go give a beating, give a beating. If you got to go kill somebody, being able." A. 635. The Government also elicited that in Fiordilino's criminal world being "capable" was a valued trait. A. 635-636. To drive the point home, Fiordilino claimed that he experienced a "metamorphosis" following the murder that he committed. A. 656.

Furthermore, the Government presented Fiordilino—as well as its other organized crime cooperators—as an authority on organized crime by having him testify with respect to his long familial history in organized crime, his involvement in inter-crime family gambling operations, and defining organized crime terms of

art such as "acting" and "the life," among others.  *See, e.g.*, A. 600-602, 611, 613, 616-623.  In addition, Fiordilino testified specifically with respect to Vernace's alleged role in organized crime.  *See, e.g.,* A. 601, 609.

The importance of Fiordilino to the Government's case cannot, therefore, be minimized.  Consequently, the fact that he was in violation of a material term of his cooperation agreement at the time of his testimony—and had been for several years—would undoubtedly have undermined not only his testimony but the Government's case as a whole.

Indeed, had the jury known that a cooperator continued to engage in criminal conduct—even as he sat upon the witness stand and swore to tell the truth—in violation of the cooperation agreement that is supposed to ensure the veracity of all of the cooperators, it is beyond question that that would have raised "a reasonable doubt in the minds of enough jurors to prevent a conviction."  *Wolfson*, 2008 WL 1969730, *1 (internal quotation marks omitted).

Accordingly, we respectfully submit that the district court erred in denying Vernace's motion for a new trial.

## CONCLUSION

In light of the foregoing, we respectfully request that the Court **(1)** find that there is insufficient evidence to support the jury's verdict with respect to (a) Racketeering Act One, the Heroin Charges, (b) Racketeering Acts Two and Three,

the Murders, and (c) Count Two, the firearms charge; **(2)** order a new trial based

upon the prejudicial spillover from the preceding charges for which there is

insufficient evidence; and **(3)** order a new trial based upon the newly discovered

evidence that a crucial cooperating witness engaged in an ongoing pattern of

criminal conduct throughout his cooperation.

Dated: January 15, 2015
     New York, New York

                                   Respectfully Submitted,


                                   s/Seth Ginsberg_____
                                   SETH GINSBERG
                                   Law Office of Seth Ginsberg
                                   299 Broadway, Suite 1405
                                   New York, New York 10007
                                   212-537-9202
                                   srginsberg@mac.com


                                   *Attorney for Bartolomeo Vernace*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 19,175 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  There is, however, a motion pending for permission to file a brief of 20,000 words and it is, therefore, respectfully requested that this brief be accepted for filing.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14 point Times New Roman font.

s/Seth Ginsberg_____
SETH GINSBERG

*Attorney for Appellant*

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Judgment, filed May 30, 2014 ................................... SPA-1

AO 245B   (Rev. 10/2011 EDNY) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| BARTOLOMEO VERNACE | Case Number:  11-CR-05-01 (SLT) |
| | USM Number:  78873-053 |
| | CHARLES CARNESI, ESQ. |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s)   **ONE, TWO & THREE OF SUPERSEDING INDICTMENT (S-5).**
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1962(c) & 1962(d) | RACKETEERING CONSPIRACY | 01/2011 | ONE |
| 18 U.S.C. § 924(c)(1)(A)(iii) | USING, CARRYING, AND POSSESSING A FIREARM IN RELATION TO A CRIME OF VIOLENCE | 01/2011 | TWO |

The defendant is sentenced as provided in pages 2 through __5__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

MAY 27, 2014
Date of Imposition of Judgment

/s/(SLT)

Signature of Judge

SANDRA L. TOWNES, U.S.D.J.
Name and Title of Judge

MAY 27, 2014
Date

SPA-2

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 1A

| | | | Judgment—Page | 2 | of | 5 |

DEFENDANT:     BARTOLOMEO VERNACE
CASE NUMBER:   11-CR-05-01 (SLT)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1955 | ILLEGAL GAMBLING | 01/2011 | THREE |

SPA-3

AO 245B   (Rev. 09/11) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of ___5___

DEFENDANT:          BARTOLOMEO VERNACE
CASE NUMBER:        11-CR-05-01 (SLT)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**Count One: LIFE**
**Count Two: TEN (10) YEARS**
**Count Three: FIVE (5) YEARS**
**The sentence imposed for Count Two is to run consecutively to the sentences on Counts One and Three. The sentence imposed for Count Three is to run concurrently to the sentence on Count One.**

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SPA-4**

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___4___ of ___5___

DEFENDANT:        BARTOLOMEO VERNACE
CASE NUMBER:      11-CR-05-01 (SLT)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 300.00 | $ 0 | $ 0 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA-5**

|  |  |
|---|---|
| DEFENDANT: | BARTOLOMEO VERNACE |
| CASE NUMBER: | 11-CR-05-01 (SLT) |

Judgment — Page  5  of  5

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ Lump sum payment of $ __300.00__ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance    ☐ C,    ☐ D,    ☐ E, or    ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.